# In the United States Court of Federal Claims

No. 08-847 L
Filed June 1, 2009
TO BE PUBLISHED

| | |
|---|---|
| BARLOW & HAUN, INC., *et al.*, | ) Rule 12(b)(1); Rule 12(b)(6); statute of |
|  | ) limitations; accrual of breach of contract and |
| Plaintiffs, | ) taking claims; ripeness; taking alleged |
|  | ) concurrently with breach of contract by |
|  | ) Government |
| v. | ) |
|  | ) |
| THE UNITED STATES, | ) |
|  | ) |
| Defendant. | ) |

## OPINION AND ORDER

Drake D. Hill, Orintha E. Karns, Brown, Drew & Massey, LLP, Casper, Wyoming, for plaintiffs.

E. Barrett Atwood, Trial Attorney, John C. Cruden, Acting Assistant Attorney General, United States Department of Justice, Environment and Natural Resources Division, Natural Resources Section, Washington, D.C., for defendant. John S. Retrum, Attorney, Office of the Regional Solicitor, Department of the Interior, of counsel.

GEORGE W. MILLER, Judge

Defendant has moved pursuant to Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC") to dismiss plaintiffs' complaint in its entirety as barred by the statute of limitations, or in the alternative, to dismiss plaintiffs' Fifth Amendment taking claim, pursuant to Rule 12(b)(6), as precluded by the existence of a contract between the parties. For the reasons set forth below, defendant's motion is **DENIED**.

I. Background

The dispute in this case centers around a conflict between oil and gas producers and trona miners who hold rights to those resources with respect to the same land in the state of Wyoming. Trona is a "relatively rare sodium-rich mineral" which is "mined and then processed into soda ash" for use in glassmaking, soap, paper manufacturing and water treatment—it is "an ingredient in both sodium bicarbonate (baking soda) and sodium phosphate (detergents)." Defendant's

Motion to Dismiss the Complaint (docket entry 8, Feb. 9, 2009) ("Def.'s Mot.") at 4 n.4; Plaintiffs' Response Brief in Opposition to Defendant's Motion to Dismiss (docket entry 9, March 12, 2009) ("Pls.' Opp.") at 4 n.1.  Sweetwater County, Wyoming "accounts for approximately 30% of the total global production and 90% of total domestic soda ash production."  Def.'s Mot. at 4 n.4.

Plaintiffs Barlow & Haun, Inc., TriContinental Resources, and NOWIO-S, LLC, (collectively, "plaintiffs" or "Barlow") presently own oil and gas lease rights within an area of Sweetwater County designated as the "Known Sodium Leasing Area" ("KSLA") and, for the purposes of this motion, are considered to also be within a smaller portion of the KSLA called either the "Mechanically Mineable Trona Area" ("MMTA") or the Oil Gas Trona Management Area ("OGTMA").  Compl. ¶ 2 (docket entry 1, Nov. 26, 2008); Defendant's Reply Brief in Support of Its Motion To Dismiss (docket entry 11, March 30, 2009) ("Def.'s Reply") at 2 n.2.[1]  According to documents attached to defendant's motion to dismiss, these lease contracts were originally entered into at various times in the 1980s and early 1990s.  Exhibits to Def.'s Mot.

But the KSLA is also the largest known deposit of trona, and is the only location of underground trona mining in the United States.  Ex. 13 to Affidavit of Mark J. Doelger, Ex. A to Pls. Opp. ("Doelger Aff.").  The Bureau of Land Management ("BLM") has long been considering a conflict between the holders of rights to oil and gas deposits and the rights of trona miners.  *See, e.g.*, Doelger Aff. (noting existence of conflict since 1991).

The controversy arose because the mining of trona involves the employment of underground miners, and "[t]hose within the trona mining industry asserted that, through the process of exploring for and producing natural gas, natural gas might be released into the underground trona mines thereby jeopardizing the health and safety of trona miners."  Compl. ¶ 15.  BLM attempted to resolve the conflict with a "first in time, first in right" rule, but "this was not supported by either industry."  Ex. 13 to Doelger Aff.  BLM then formed a Joint Industry Committee ("JIC") to study the risk to trona miners from concurrent oil and gas development.  Compl. ¶ 16. On May 1, 1995, BLM suspended oil and gas operations in the MMTA and KSLA for one year, and extended those suspensions on a yearly basis through 1999.  *Id.*

In January of 2000, the BLM issued a notice of intent "to conduct a planning review and request for public participation concerning closing portions of the trona mining areas to oil and gas leasing for protection of health and safety."  65 Fed. Reg. 3243 (Jan. 20, 2000) ("Technical studies and analysis with safety and economic comparisons show that the mineable trona within

---

[1] The Court and defendant make certain assumptions for the purposes of this motion. The first is that plaintiffs owned all of the lease rights on all of the dates that might be pertinent to this lawsuit.  *See* Def.'s Reply at 10 n.9 (indicating a number of transfers of the leases "at various points between May 2000 and now").  The second is that all leases are within the KSLA and MMTA, and finally we assume that there are no material differences in the terms of the individual lease agreements.  Def.'s Mot. at 3 nn.1, 3.

the MMTA should be completely extracted before development of deep natural gas resources."). The JIC recommended that the BLM land use plan be modified to "close the MMTA to oil and gas leasing and development for drilling of deep gas wells. Drilling would be prohibited until after completion of conventional underground trona mining and abandonment of the underground trona mines." Ex. 6 to Doelger Aff. Recognizing the existence of oil and gas leases, the JIC observed that "the adoption of the above recommendations may be somewhat problematic" and recommended certain options. *Id.* The notice that BLM published in the Federal Register requested public comment evaluating those options, as follows: (1) maintaining lease suspensions until underground trona mining was complete; or (2) allowing current oil and gas suspensions to expire and then placing conditions on approval of drilling applications; or (3) allowing oil and gas lessees a preferential right to trade their leases for other federal or state leases of comparable value; or (4) purchasing existing federal and state oil and gas leases. *Id.*; 65 Fed. Reg. 3243 (Jan. 20, 2000).

On May 1, 2000, the BLM "issued an indefinite suspension of oil and gas operations to allow the JIC to pursue a technical solution for the concurrent development and production of trona and oil and gas" within the KSLA. Compl. ¶ 16; Ex. 36 to Def.'s Mot. ("A peer review of the JIC report has not yet been completed, so it is not known if additional analysis will be required before a final decision can be made. As such, the suspensions on the leases listed below will remain in effect indefinitely."); *see also* Ex. 1 to Doelger Aff. (May 2001 newspaper article observing that "[f]ederal officials will decide next month whether to back off proposed safety recommendations aimed at protecting underground trona miners from deep natural gas drilling"). In May of 2001, while peer review was underway, the BLM allowed Yates Petroleum Corporation to study the JIC data and run its own models to determine whether concurrent development could occur. Pls.' Opp. at 7, Doelger Aff. at 6.

In April of 2004, BLM conducted a public information-sharing session regarding its plans for resolving the trona/oil and gas conflict. Ex. 12 to Doelger Aff. In a slide presentation, BLM reviewed the actions it had taken with respect to the issue as follows:

> 1993 - Suspend all oil & gas leasing in KSLA
> 1993 - Develop concept of Mechanically Mineable Trona Area (MMTA) and begin placing existing oil and gas leases within this boundary into suspension
> 1994 - Formation of Joint Industry Committee (JIC)
> 1995 - Field study of the interaction between mining and a 'dummy' oil & gas well begins
> 1999 - Technical considerations of issue completed with submittal of report to JIC to BLM Wyoming State Director
> 2002 - Yates Petroleum submits response to JIC proposals to BLM Wyoming State Director
> 2004 - BLM is ready to present a solution

Ex. 13 to Doelger Aff. While the Court does not possess complete information regarding the

events referred to in this slide, the list of significant actions does not include the 2000 indefinite suspension of oil and gas leases. The "proposed solution," presented a few slides later, was to "[a]dminister a portion of the KSLA exclusively for trona extraction until conventional trona mining is complete." *Id.* That portion of the KSLA reserved for trona mining would then be designated as the OGTMA. *Id.* The Court assumes for the purposes of this motion that the OGTMA and the MMTA are coterminous. *See supra* n.1; *see also* 69 Fed. Reg. 42204 (July 14, 2004) (requesting public comment on establishment of certain lands as the MMTA); Ex. 16 to Doelger Aff. (noting that outline of OGTMA had been published in the Federal Register); Ex. 17 to Doelger Aff. (BLM publication stating that OGTMA "is now referred to" as MMTA, and noting adjustment of boundary in response to comments). Mary Minihan of Barlow & Haun then apparently wrote to the BLM regarding the oil and gas leases within the OGTMA, and Susan J. Davis, Acting Assistant Field Manager of BLM, responded that "[t]he decisions regarding management of Federal oil and gas leases in the OGTMA have not been made at this time." Ex. 15 to Doelger Aff.

In July of 2007, the BLM issued a Draft Resource Management Plan and Environmental Impact Statement. Ex. 38 to Def.'s Mot. The cover letter to the draft stated that "[w]hile a preferred alternative is identified, selection of the final plan has not been made. The final decision will be made only after consideration of comments received" on the draft. *Id.* Plaintiffs' complaint asserts that this July 2007 action gave rise to their claims. Compl. ¶ 18. Plaintiffs contend that at this time the BLM recommended that oil and gas operations in the KSLA and MMTA be suspended until the completion of trona mining. Compl. ¶ 18. The BLM estimated that "trona mining will continue for at least two hundred more years. As a result, the BLM has permanently suspended oil and gas operations and has thereby taken all value in the oil and gas leases." *Id.*

Although plaintiffs' complaint appears to rely on the July 2007 government action as triggering their claim, their opposition to defendant's motion to dismiss characterizes the July 2007 plan as not yet final, and instead relies upon an August 8, 2008 Proposed Resource Management Plan and Final Environmental Impact Statement as the relevant event ripening their claims. Ex. 19 to Doelger Aff.; *see also* Doelger Aff. at 8; *see also* 73 Fed. Reg. 49702 (Aug. 22, 2008) (advising of availability of Proposed Resource Management Plan/Final Environmental Impact Statement). The Final Resource Management Plan (RMP) and the Record of Decision (ROD) were expected to be released in January 2009, Ex. 21 to Doelger Aff., but had not been released as of February 18, 2009, Ex. 22 to Doelger Aff.

On November 26, 2008, plaintiffs filed this action alleging a Fifth Amendment taking without just compensation and breach of contract. Compl. ¶ 1. Defendant filed a motion to dismiss the complaint on February 9, 2009, and plaintiffs opposed that motion on March 12, 2009. Defendant replied in support of its motion on March 30, and plaintiffs moved for leave to file a sur-reply on April 13, 2009 ("Pls.' Sur-Reply") (docket entry 12). The Court **GRANTS** plaintiffs' motion for leave to file a sur-reply.

## II. Standard of Review

In ruling on a motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1), the court assumes that the allegations in the complaint are true and construes those allegations in plaintiff's favor. *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995). However, if defendant contests plaintiff's jurisdictional allegations, plaintiff bears the burden of proving, by a preponderance of the evidence, facts sufficient to invoke the court's jurisdiction. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988). The court may look to evidence outside of the pleadings to determine the existence of subject matter jurisdiction. *Land v. Dollar*, 330 U.S. 731, 735 & n.4 (1947). Both parties have attached certain documents to their submissions, and the Court refers to those materials "to the extent that they allow the court to determine whether it has jurisdiction over this case." *Lechliter v. United States*, 70 Fed. Cl. 536, 543 (2006). If the court concludes that it lacks subject matter jurisdiction over a claim, RCFC 12(h)(3) requires the court to dismiss that claim.

Dismissal of a complaint is appropriate under RCFC 12(b)(6) "when the plaintiff can prove no set of facts that would warrant the requested relief, when drawing all well-pleaded factual inferences in favor of the complainant." *Levine v. United States*, 453 F.3d 1348, 1350 (Fed. Cir. 2006). If the facts alleged reveal any possible basis on which the plaintiffs might prevail, the court must deny the motion. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) (citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). Plaintiffs must, however, do more than recite the elements of a cause of action; they must make sufficient factual allegations to "raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007). The complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," meaning that "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 2009 WL 1361536 (U.S. May 18, 2009).

## III. Analysis

### A. *Statute of Limitations*

Defendant asserts that plaintiffs' cause of action accrued no later than May 1, 2000, and therefore this lawsuit, filed on November 26, 2008, was not within the six-year limitations period imposed by 28 U.S.C. § 2501 ("Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues."). Def.'s Mot. at 8. This is a jurisdictional limitation that cannot be waived. *John R. Sand & Gravel v. United States*, 552 U.S. 130 (2008).

This Court is not to determine "whether a plaintiff will ultimately prevail, but whether claimant is entitled to offer evidence to support the claims." *Hansen v. United States*, 65 Fed. Cl. 76, 94 (2005) (quoting *Scheuer*, 416 U.S. at 232). "Denial of a taking claim on the basis of the defense of limitations is warranted only when the facts alleged demonstrate conclusively that

such a decision is required as a matter of law." *Juda v. United States*, 6 Cl. Ct. 441, 450 (1984).

In its opening motion, defendant claims that the only event plaintiffs allege within the relevant six-year period is issuance in July 2007 of BLM's Draft Resource Management Plan which "proposed four alternative management plans for the subject planning area, did not adopt any specific plan, and invited public comment in advance of completing via Record of Decision a final Resource Management Plan." Def.'s Mot. at 9. Citing *Goodrich v. United States*, 434 F.3d 1329, 1333-34 (Fed. Cir. 2006), defendant states that such an agency proposal is not final agency action sufficient to trigger any governmental liability, and "the suspension recommended in 2007 has not been adopted and has in no way altered plaintiffs' rights." Def.'s Mot. at 9. Moreover, even if the recommendation were final agency action, it did not change the plaintiffs' rights as they existed after the indefinite suspension of the leases in 2000. *Id.* According to defendant, "[a]n indefinite suspension has no end, and is the functional equivalent of a permanent suspension." *Id.* at 10. Defendant relies for this proposition on *Caldwell v. United States*, 391 F.3d 1226, 1234-35 (Fed. Cir. 2004), which holds that the issuance of a notice of interim trail use or abandonment sets the accrual date for a physical taking claim, and *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 216 F.3d 764, 781-82 (9th Cir. 2000), *aff'd*, 535 U.S. 302 (2002), which rejected treating a temporary moratorium as a categorical taking when the affected property owners did not anticipate that the moratorium would continue indefinitely. Def.'s Mot. at 10 & n.6. In the latter case, however, the court relied heavily on the fact that the property owners had reason to believe the moratorium would be lifted. *Tahoe-Sierra*, 216 F.3d at 781-82; *see also Tahoe-Sierra*, 535 U.S. at 323-25 (rejecting application of *per se* rules in regulatory taking cases in favor of "essentially ad hoc, factual inquiries, designed to allow careful examination and weighing of all the relevant circumstances") (internal citations and quotations omitted).

And plaintiffs assert that "[s]ince 2000, the BLM has repeatedly stated in writing that no decision had been made" regarding the permanency of the suspension. Pls.' Opp. at 12 (citing 65 Fed. Reg. 3243 (Jan. 20, 2000)). As illustrated above, after 2000 "BLM continued extensive study and analysis of the issue of concurrent development of oil and gas and trona . . .; organized an industry peer review team to analyze the conclusion of Yates' experts; extended the public comment periods to collect all views; gave public presentations on the issue; adjusted the boundaries of the MMTA; and finally, submitted the matter to resolution" as part of a regional resource management plan process. Pls.' Opp. at 12; *id.* at 6 (BLM "has continued to put off making a final decision as long as possible, has continued its analysis, and has represented that the final decision had yet to be made."); *id.* at 5 ("[I]t appears that the BLM simply postponed, over and over again, making any final decision."). Because the plaintiffs had to show that the Government had taken a specific action that fixed its liability, they claim that they could not have sued while the BLM was still representing that a decision was yet to be made. Pls.' Opp. at 13.

There is, at present, some doubt regarding the date of the accrual of a physical taking claim versus the date at which such a claim becomes ripe for litigation. *See, e.g.*, Bridget Tomlinson, *Statutes of Limitations in Rails-to-Trails Act Compensation Claims*, 56 CATH. U. L.

REV. 1307 (2007) (observing that under certain recent Federal Circuit decisions relating to the accrual of a physical taking claim "the landowner may not have a viable [that is, ripe] claim until after the statute of limitations has already run").  In this case, however, we consider a regulatory taking claim, which "will not accrue until the claim is ripe." *Royal Manor, Ltd. v. United States*, 69 Fed. Cl. 58, 61 (2005); *Bayou Des Familles Dev. Corp. v. United States*, 130 F.3d 1034, 1038 (Fed. Cir. 1997) (observing that "starting the statute of limitations clock" occurs when the "takings claim became ripe for adjudication").

A regulatory taking claim is ripe (and thus accrues) when "the administrative agency has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question."  *Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 191 (1985). Ordinarily, the extent of the restriction on property is not known until the land-use authority has an opportunity to "us[e] its own reasonable procedures to decide and explain the reach of a challenged regulation" but is "likely to have ripened" when "the permissible uses of the property are known to a reasonable degree of certainty."  *Palazzolo v. Rhode Island*, 533 U.S. 606, 620 (2001); *see also Washoe County, Nev. v. United States*, 319 F.3d 1320 (Fed. Cir. 2003).  A plaintiff does not need to pursue futile avenues, such as waiting for a formal permit denial or final decision, when it is clear that no project will be approved. *Washoe County*, 319 F.3d at 1324 ("[A] claimant must have first followed reasonable and necessary steps to allow regulatory agencies to exercise their full discretion so that the extent of the restriction on property is known. Government authorities, of course, may not burden property by imposition of repetitive or unfair land-use procedures in order to avoid a final decision.  Thus, there is no requirement that a claimant submit applications for their own sake when there is no uncertainty as to the property's permitted use.") (internal citations and quotations omitted).

A breach of contract claim accrues "when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action." *Plaintiffs in Winstar-Related Cases v. United States*, 37 Fed. Cl. 174, 181 (1997) (quoting *Oceanic S.S. Co. v. United States*, 165 Ct. Cl. 217, 225 (1964)).  "The mere announcement that the Government does not intend to perform its contractual obligation is a repudiation, not a breach, and that repudiation does not commence the running of the statute of limitations." *Franconia Assocs. v. United States*, 536 U.S. 129, 142-43 (2002).  Such a repudiation ripens into a breach either when the Government actually fails to honor its obligations or when the promisee brings suit.  *Id.* at 133, 143.  The parties' briefs focus upon the standard for the accrual of a taking claim, but there is also a breach of contract claim at issue here.  Because the time for the Government's performance and a refusal to perform (*i.e.*, a refusal of a specific request by plaintiffs to mine), does not appear to have yet taken place, for the limited purposes of this motion and for the reasons stated below, the Court construes the indefinite suspensions of the leases as a repudiation of the plaintiff's contract rights that did not accrue as a breach of contract until the plaintiffs chose to treat them as a breach by filing suit.  *Franconia*, 536 U.S. at 143.  Thus, the breach of contract claim is timely filed.

The parties seem to agree on most of the pertinent facts, but perceive their significance

differently. In defendant's view, on May 1, 2000, plaintiffs' leases were indefinitely suspended. They remain indefinitely suspended and will be so until the completion of trona mining. Thus, the relevant facts have not changed from May 1, 2000 to the present. Defendant dismisses all events after the May 1, 2000 indefinite suspensions of the leases as irrelevant. Def.'s Reply at 2-3 ("None of the various meetings held, reports or letters written, or mere hopes espoused by Plaintiffs have changed or any way altered their lease rights."). Defendant maintains that although plaintiffs are correct that there were a number of post-2000 studies, discussions, meetings, *et cetera*, "the last governmental action *affecting* plaintiffs' lease rights occurred in May 2000 when the Leases were indefinitely suspended" and "no governmental action concerning the issue of concurrent development has occurred since 2000." In defendant's view, the "key question is whether plaintiffs' lease rights have been unaltered by governmental action since May 2000" and, defendant asserts, they have not changed one iota. Def.'s Reply at 3.

Plaintiffs, on the other hand, contend that their leases were repeatedly suspended for fixed periods while the BLM tried to figure out how to reconcile their rights with the rights of the trona miners and, following these successive suspensions of fixed durations, the BLM instituted an indefinite suspension while it continued to work on a solution to the clash of rights. At some point after 2000, whether 2002 or 2004 or 2008, the Government made it clear that plaintiffs would not be allowed to develop their oil and gas leases after all. At that point, plaintiffs contend, a taking occurred. Plaintiffs' position is that the "the permissible uses of the property" were not "known to a reasonable degree of certainty" until sometime within the six-year limitations period. While the plaintiffs specifically argue for July 2007 and August 2008 as particular accrual dates, the Court does not believe it is necessary to fix a definite accrual date at this point if the accrual would have been sometime within the limitations period.

Thus, the dispute over the accrual of the taking claim boils down to whether the May 1, 2000 indefinite suspension put plaintiffs on notice that no concurrent development would ever be permitted. It is true, as defendant points out, that the January 2000 BLM proposal recommended completely extracting the trona before allowing development of the oil and gas resources. Def.'s Reply at 5; 65 Fed. Reg. 3243 (Jan. 20, 2000). It is not the case, however, that "[a]n objective reading of these facts shows that there was no doubt that concurrent development would not be permitted." Def.'s Reply at 5. The notice published in the Federal Register says, as the Court reads it (in the light most favorable to plaintiffs): (1) a committee has looked at this problem and recommended suspending oil and gas development; (2) if we did that, we'd have a problem with the oil and gas leaseholders; (3) here are four things we might do to alleviate the oil and gas lease problem; and (4) we invite comment on these four possibilities and any suggestions as to additional options we should consider ("The BLM is seeking public comment on these options and asking the public for additional options that should be addressed in the environmental analysis for the land use plan amendments."). It would have been quite reasonable of the plaintiffs to conclude that the BLM would protect their rights in some manner before finalizing any plan—either by finding a way to allow some development of their leaseholds or, in the event that was not possible, providing compensation to them, either through one of the methods described in the notice or otherwise. The plaintiffs could not, the Court believes, have

successfully sued for a taking on May 2, 2000, because the Government would undoubtedly have argued that it had not completed the regulatory process, no final decision had been made, and the claim was not ripe. *See, e.g.*, *Bayou Des Familles*, 130 F.3d at 1037-38 (noting that the Government "uses the ripeness doctrine as both a sword and a shield"); Pls.' Opp. at 18.

Although the notion of refusing all oil and gas permits until trona mining was complete was on the table as early as 2000, the documents submitted by the parties purport to show that the BLM's position in April 2004 was that its 2000 proposal was "not a final determination" and it was requesting further public comment while it considered what to do. Ex. 13 to Doelger Aff. In 2004 BLM presented the notion that oil and gas development could not occur simultaneously as though it were new information. Exs. 12 & 13 to Doelger Aff. That is, in the 2004 slide presentation, after the slide recapping pertinent events and ending "2004 - BLM is ready to present a solution," the next slide reads:

> Conclusions:
> 1. There is no way to entirely eliminate the risk to underground miners posed by the presence of a near-by oil and gas well.
> 2. Minimizing the potential for interactions to the greatest extent possible would put an unacceptable burden or risk upon one or both industries.
> 3. Though technically feasible, oil and gas development and trona mining in close proximity are incompatible.
> 4. BLM is unwilling to authorize activities that place resource recovery above health and safety."

The following slide presents the "Proposed Solution: Administer a portion of the KSLA exclusively for trona extraction until conventional trona mining is complete." That slide also states that "Federal oil & gas leases within OGTMA will continue in suspension indefinitely." Ex. 13 to Doelger Aff. The subsequent slides propose an area to be defined as the OGTMA, and compare that area to the spatial distribution of trona and oil and gas leases. Indeed, the "goal of the [2004] meeting" was to "inform the public and the industry of our intent to modify the manner in which we will manage the Federal oil, gas, and sodium (trona) resources." Ex. 12 to Doelger Aff. In August of 2004, the documents indicate that plaintiffs and BLM were discussing whether shallow wells would still be permitted, despite the ban on other types of oil and gas development. Ex. 16 to Doelger Aff.; Def.'s Reply at 7. The Court has no doubt that there were many distinct issues considered in developing the Resource Management Plan, but for the purposes of considering a motion to dismiss on statute of limitations grounds, the Court cannot conclude that the resolution of the future state of the oil and gas leases came to rest on May 1, 2000, since it appears to have been in play at least through 2004.

The draft Resource Management Plan that BLM issued in July of 2007 continued to state that even then the proposal was "not a final determination." Ex. 19 to Doelger Aff. Plaintiffs allege that on August 8, 2008, when the BLM issued its Proposed Resource Management Plan and Final Environmental Impact Statement, "the BLM quit accepting comment and public input,

[and] the Government's liability was fixed as the Damaged parties then knew with reasonable certainty the likely extent of their damages and the Government's liability." Pls.' Opp. at 15.

The Court cannot conclude that the foregoing facts demonstrate that dismissal of plaintiffs' breach of contract or taking claims on statute of limitations grounds "is required as a matter of law." *Juda*, 6 Cl. Ct. at 450; *Winstar-Related Cases,* 37 Fed. Cl. at 183. For the same reasons, the Court cannot agree that because the suspension was "indefinite," plaintiffs could have had no expectation that it would be lifted. Def.'s Reply at 6; *compare* Pls.' Opp. at 6 (the suspension "seemed at that point to be temporary"). The Court is also mindful that "[p]enalizing plaintiffs for trying to cooperate with the government instead of immediately filing suit would be incompatible with the Supreme Court's mandate in *United States v. Dickinson* that taking claims 'be enforced with an eye toward fairness.'" *Reed Island-MLC, Inc. v. United States*, 67 Fed. Cl. 27, 33-34 (2005) (quoting *Forsgren v. United States*, 64 Fed. Cl. 456, 460 (2005); citing *United States v. Dickinson*, 331 U.S. 745 (1947)). Defendant's motion pursuant to RCFC 12(b)(1) to dismiss plaintiffs' breach of contract and taking claims as barred by the statute of limitations is therefore **DENIED**.

### B. Concurrent Taking and Breach of Contract Claims

Defendant alleges, in the alternative, that the plaintiffs fail to assert a valid taking claim because the "concept of a taking as a compensable claim theory has limited application to the relative rights of party litigants when those rights have been voluntarily created by contract." Def.'s Mot. at 11 (quoting *Hughes Comm'n Galaxy, Inc. v. United States*, 271 F.3d 1060, 1070 (Fed. Cir. 2001)). Because "remedies arise from the contracts themselves, rather than from the constitutional protection of private property rights," defendant argues, "courts consistently dismiss taking claims premised on oil and gas and other leases similar to those in the case at bar." *Id.* at 11 (citing *Marathon Oil Co. v. United States*, 16 Cl. Ct. 332, 338-39 (1989); *Sun Oil Co. v. United States*, 572 F.2d 786, 818-19 (Ct. Cl. 1978); *Buse Timber & Sales, Inc. v. United States*, 45 Fed. Cl. 258, 263-64 (1999)).

We begin with the proposition that "[r]ights against the United States arising out of a contract with it are protected by the Fifth Amendment." *Lynch v. United States*, 292 U.S. 571, 579 (1934); *see also United States v. Perry Motor Co.*, 327 U.S. 372 (1946) (taking of leasehold interest in property). But "plaintiffs would only be entitled to one recovery" from a Fifth Amendment taking that also constituted a breach of contract, so "the taking claim is an alternative claim to the breach of lease contract claim." *Sun Oil*, 572 F.2d at 817.

Defendant is correct that in general, where rights are created by a government contract, a taking theory "has limited application." *Sun Oil*, 572 F.2d at 818; *see also J.J. Henry Co. v. United States*, 411 F.2d 1246, 1249 (Ct. Cl. 1969); *Marathon Oil*, 16 Cl. Ct. at 339. Ordinarily, the Government's interference with contractual rights arising under a contract with the Government will give rise to a breach of contract action, rather than a taking claim. *Sun Oil*, 572 F.2d at 818. But the mere existence of a contract is not necessarily fatal to a concurrently alleged

taking claim. *Integrated Logistics Support Sys. Int'l v. United States*, 42 Fed. Cl. 30, 34 (1998) ("[T]aking claims are not presumed to be foreclosed by claims for breach of express contract merely because the claims share the same factual background.") (citing *United States v. General Motors Corp.*, 323 U.S. 373 (1945) (proposing Fifth Amendment taking clause as alternative means for relief in action involving alleged breach of express lease agreement)).

Defendant argues that its "acts suspending the Leases were done pursuant to its contractual rights, working 'within the framework of the lease[s] and applicable regulations.'" Def.'s Mot. at 13 (quoting *Sun Oil*, 572 F.2d at 818). According to defendant, "the Leases explicitly incorporate all applicable laws, regulations, and orders of the Secretary, and they explicitly provide that they may be suspended. Any suspension issued pursuant to this authority is within Defendant's contractual rights because that authority is explicitly incorporated by the Leases." Def.'s Mot. at 13. The defendant points to no provision of the contract itself that permits suspension of the leases, but instead invokes 30 U.S.C. §§ 209, 226(i) and 43 C.F.R. § 3103.4-4 as providing authority for the suspensions. Because this incorporation creates a "contract term" that governs the actions the Government took, defendant alleges, it acted within the terms of the contract and the suspensions cannot constitute a taking. Def.'s Mot. at 13.

It is true, as noted above, that when the Government enters into a contract in a commercial capacity, the concept of a Fifth Amendment taking has limited applicability. But the Government's contractual authority to suspend the leases is not dispositive on the question of the permissible co-existence of a taking claim. Whether a plaintiff can achieve success on a concurrently alleged taking claim requires examination of whether the property rights alleged to have been taken were solely created by the terms of the contract. *Tamerlane, Ltd. v. United States*, 80 Fed. Cl. 724, 738 (2008) ("Although rights existing independently of a contract may be brought pursuant to a takings claim, . . . when a contract between a private party and the Government creates the property right subject to a Fifth Amendment claim, the proper remedy for infringement lies in contract, not taking.").

Where "the rights respecting the 'taken' [property] were not reduced to writing by the parties, both takings and breach claims have been permitted." *Buse Timber*, 45 Fed. Cl. at 262. In other words, "[i]f the right at issue is not governed by the terms of the parties' contract, plaintiff may pursue a takings remedy to vindicate that right." *Detroit Edison Co. v. United States*, 56 Fed. Cl. 299, 302 (2003). As defendant acknowledges, when a court cannot determine "at the motion to dismiss stage, whether the . . . plaintiffs' claims involve[] rights beyond their contractual rights" then both claims are permitted to proceed to discovery. Def.'s Reply at 15. It may well be true that the only property rights plaintiffs possess are those derived from the contract, and that plaintiffs will eventually be constrained to pursue only a breach of contract claim. But plaintiffs' complaint alleges not only that "the BLM has taken the value of the oil and gas leases" but also that it has taken the "private property vested in the oil and gas leases at issue." Compl. ¶ 23. The Court is unable to ascertain at this stage whether all the rights that plaintiffs allege have been taken were reduced to writing by the parties.

Because determining whether rights are included within the scope of a contract can be a subtle and complicated task, other judges of this court have refrained from "an early ruling that could prevent plaintiff[s] from vindicating [their] rights—whether under the [contract] or takings jurisprudence, assuming . . . that plaintiff has rights that are due to be vindicated." *Detroit Edison*, 56 Fed. Cl. at 302 ("A more fully developed record will allow the court to assess whether the property right implicated in plaintiff's takings claim falls outside the rights granted under the [contract]."); *see also System Fuels, Inc. v. United States*, 65 Fed. Cl. 163, 172 (2005) ("Given that the standard for determining whether a regulatory taking has occurred is both fact-intensive and case-specific, developing a more comprehensive record is appropriate."). Thus, this court's judges routinely allow Fifth Amendment taking allegations to proceed where breach of contract is pled as an alternative—at least until determining whether there has been a breach, and sometimes until the entry of judgment. *System Fuels*, 65 Fed. Cl. at 172 (citing *Sacramento Mun. Util. Dist. v. United States*, 63 Fed. Cl. 495, 501 (2005); *Allegre Villa v. United States*, 60 Fed. Cl. 11, 19 (2004); *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 656 n.8 (2003)); *see also Consol. Edison Co. of New York v. United States*, 67 Fed. Cl. 285, 292 (2005) ("[C]laims of a breach of contract and a taking may be brought concurrently and may proceed at least until the contract claim becomes viable and trumps the takings claim."). The Court cannot conclude, at the motion to dismiss stage, that no rights beyond those created by the terms of the leases were taken. *Sun Oil*, a case upon which defendant heavily relies, did dismiss a similar takings claim, Def.'s Mot. at 12, but only after discovery and extensive findings of fact. *Sun Oil*, 572 F.2d at 795 ("The findings of fact deal in great detail with the varied and myriad facts advanced by the parties in this litigation.").

This Court similarly declines to make any determination at this early stage regarding the effect on plaintiffs' taking claim of their having alleged breach of contract and taking claims in the alternative. *See, e.g., Del-Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358 (Fed. Cir. 1998); *United Nuclear Corp. v. United States*, 912 F.2d 1432, 1437 (Fed. Cir. 1990); *Devon Energy Corp. v. United States*, 45 Fed. Cl. 519 (1999). The Government's motion pursuant to RCFC 12(b)(6) to dismiss plaintiffs' Fifth Amendment taking claim as barred by the existence of the parties' contract is therefore **DENIED**. The Government shall file its answer to plaintiffs' complaint no later than **Tuesday, June 16, 2009**.

**IT IS SO ORDERED**.

  s/ George W. Miller
GEORGE W. MILLER
Judge