# In the United States Court of Federal Claims

No. 08-847L
(Filed: September 26, 2014)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| BARLOW & HAUN, INC., a Wyoming Corporation et al., | * | Trial; Suspension of Oil and Gas Leases; |
| | * | Concurrent Development of Oil and Gas and |
| Plaintiffs, | * | Trona; Resource Management Plans; Breach |
| | * | of Contract; Fifth Amendment Taking; |
| v. | * | Jurisdiction; Statute of Limitations; |
| | * | Justiciability; Ripeness; Standing; |
| THE UNITED STATES, | * | Repudiation |
| | * | |
| Defendant. | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Drake D. Hill, Casper, WY, for plaintiffs.

E. Barrett Atwood, United States Department of Justice, San Francisco, CA, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

This case concerns twenty-six leases for oil and gas deposits in southwestern Wyoming. Defendant, as lessor, has simultaneously acknowledged valid existing rights and indefinitely suspended operations and production under the leases. This indefinite suspension, plaintiffs contend, excuses their obligation to seek the required permits from defendant to develop the leases, and amounts to either a breach of the leases or an uncompensated taking of the lessee's rights under the leases. Defendant counters that the court is precluded from considering plaintiffs' claims on jurisdictional and justiciability grounds, but that even in the absence of such bars, plaintiffs cannot prevail on the merits. The court held a trial on all liability and damages issues, after which the parties submitted posttrial briefs and presented closing arguments. As set forth below, the court concludes that plaintiffs' takings claim is unripe, that three of the four plaintiffs lack standing to assert a claim for breach of contract, and that the remaining plaintiff's breach-of-contract claim fails on its merits.

## FACTS

This section contains the court's findings of fact as required by Rule 52(a)(1) of the Rules of the United States Court of Federal Claims ("RCFC").[1]

## I. Statutory and Regulatory Background

The leases at issue in this case, which are described in the appendix to this decision, are subject to the federal government's statutory and regulatory authority. Jt. Stip. ¶¶ 24-25. Of particular relevance are the statutes and regulations pertaining to the commencement of oil and gas operations on land owned by the government, as well as the statutes and regulations related to the government's development and revision of land use plans.[2]

## A. Federal Oil and Gas Leasing

The Mineral Leasing Act, 30 U.S.C. §§ 181-287 (2012), originally enacted in 1920, provides the statutory framework for the disposition of mineral deposits, and the lands containing such deposits, owned by the United States. Id. § 181. Further guidance is contained in the rules and regulations that the Secretary of the United States Department of the Interior ("Secretary") is authorized to promulgate to carry out the Act's provisions. See id. § 189. The Secretary has delegated this authority to the Bureau of Land Management ("BLM"). 43 C.F.R. § 3160.0-3 (2013). The Secretary has also authorized the BLM "to issue Onshore Oil and Gas Orders when necessary to implement and supplement" the BLM's regulations; these orders apply to existing and future oil and gas leases. Id. § 3164.1; see also Onshore Oil and Gas Order Number 1, 72 Fed. Reg. 10,308 (Mar. 7, 2007). The regulations issued by the BLM contain the following general requirement:

> The [operator][3] shall comply with applicable laws and regulations; with the lease terms, Onshore Oil and Gas Orders, [and notices to lessees and operators]; and

---

[1] The court derives some of these facts from the parties' Joint Stipulation of Facts ("Jt. Stip.") and pertinent statutes and regulations. The remaining facts are derived from the transcript of testimony elicited at trial ("Tr.") and the exhibits admitted into evidence during trial ("PX," "DX," or "JX"). Citations to the trial transcript will be to the page number of the transcript and the last name of the testifying witness; if more than one witness testified to the same fact, the court might only cite to the testimony of one witness. And, where two copies of a single document have been admitted into evidence, the court will cite to only one version of the document.

[2] The court cites to the most recent versions of the pertinent statutes and regulations. Unless otherwise indicated, the statutory and regulatory provisions cited by the court have remained substantively unaltered during the time period covered by this case.

[3] An operator is "any person or entity including but not limited to the lessee or operating rights owner, who has stated in writing to the authorized officer that it is responsible under the

> with other orders and instructions of the authorized officer.  These include, but are
> not limited to, conducting all operations in a manner . . . which protects other
> natural resources and environmental quality; which protects life and property; and
> which results in maximum ultimate economic recovery of oil and gas with
> minimum waste and with minimum adverse effect on ultimate recovery of other
> mineral resources.

43 C.F.R. § 3162.1(a) (footnote added); accord id. § 3162.5-2(a); see also id. § 3162.5-1(b)
(requiring operators to "exercise due care and diligence" to ensure against "undue damage to
surface or subsurface requirements"); id. § 3162.5-2(d) (requiring operators to "isolate . . . other
mineral-bearing formations and protect them from contamination"); id. § 3162.5-3 (requiring
operators to "take all precautions necessary to provide adequate protection for the health and
safety of life and the protection of property"); 72 Fed. Reg. at 10,335 (requiring operators to
"minimize adverse effects to surface and subsurface resources" and to "protect the public from
any hazardous conditions resulting from operations").

> To commence operations under a lease, an operator must submit an Application for
Permit to Drill ("APD").  43 C.F.R. § 3162.3-1;[4] 72 Fed. Reg. at 10,330.  To be considered
administratively and technically complete, an APD must include a drilling plan, a surface use
plan of operations, evidence of bond coverage, and "[s]uch other information as may be required
by applicable orders and notices."  43 C.F.R. § 3162.3-1(d); accord 72 Fed. Reg. at 10,330-33.
The required drilling plan must contain "a description of the drilling program, the surface and
projected completion zone location, pertinent geological data, expected hazards, and proposed
mitigation measures to address such hazards," 43 C.F.R. § 3162.3-1(e), and "must be in
sufficient detail to permit a complete appraisal of the technical adequacy of, and environmental
effects associated with, the proposed project," 72 Fed. Reg. at 10,331.  Indeed, the drilling plan
must include, among other items:

> a.  Names and estimated tops of all geologic groups, formations, members,
> or zones.

> b.  Estimated depth and thickness of formations, members, or zones
> potentially containing usable water, oil, gas, or prospectively valuable deposits of
> other minerals that the operator expects to encounter, and the operator's plans for
> protecting such resources.

---

terms and conditions of the lease for the operations conducted on the leased lands or a portion
thereof."  43 C.F.R. § 3160.0-5.

    [4]  Section 3162.3-1 did not take its present form until June 1988, 53 Fed. Reg. 22,814,
22,846 (June 17, 1988), after six of the leases at issue were first acquired by one of the plaintiffs,
see App., infra.

      c.  The operator's minimum specifications for blowout prevention equipment and diverter systems to be used, including size, pressure rating, configuration, and the testing procedure and frequency.  . . .

      d.  The operator's proposed casing program, including size, grade, weight, type of thread and coupling, the setting depth of each string, and its condition.  . . .

      e.  The estimated amount and type(s) of cement expected to be used in the setting of each casing string.  . . .

    . . . .

      g.  The testing, logging, and coring procedures proposed, including drill stem testing procedures, equipment, and safety measures.

      h.  The expected bottom-hole pressure and any anticipated abnormal pressures, temperatures, or potential hazards that the operator expects to encounter, such as lost circulation and hydrogen sulfide . . . .

      i.  Any other facets of the proposed operation that the operator would like the BLM to consider in reviewing the application.  Examples include, but are not limited to:

- For directional wells, proposed directional design, plan view, and vertical section in true vertical and measured depths;

- Horizontal drilling; and

- Coil tubing operations.

<u>Id.</u>

Upon the receipt of a complete APD, the BLM posts a notice of the APD for a thirty-day period of public inspection, <u>id.</u> at 10,333-34; 43 C.F.R. § 3162.3-1(g), consults with the relevant federal surface management agency and other interested parties, 43 C.F.R. § 3162.3-1(h), and conducts an onsite inspection, 72 Fed. Reg. at 10,334.  Then, no later than five business days after the notice period, the BLM is required to (1) advise the applicant that the APD is approved; (2) return the APD with an explanation for why it was not approved; or (3) inform the applicant that a final decision will be delayed, explain the reason for the delay, and provide the date that it expects to issue a final decision.  43 C.F.R. § 3162.3-1(h); <u>accord</u> 72 Fed. Reg. at 10,334.  Prior to approving an APD, the BLM must ensure that certain other statutory and regulatory requirements have been met, such as the requirements set forth in the National Environmental Policy Act of 1969 and its implementing regulations.  72 Fed. Reg. at 10,334; <u>accord</u> 43 C.F.R. § 3162.5-1(a).  And, the BLM may condition its approval of an APD on the applicant taking

"reasonable mitigation measures to ensure that the proposed operations minimize adverse impacts to other resources, uses, and users, consistent with granted lease rights."  72 Fed. Reg. at 10,334.

The Mineral Leasing Act and its implementing regulations also provide for the suspension of leases.  Under the Act:

> The Secretary of the Interior, for the purpose of encouraging the greatest ultimate recovery of . . . oil, gas, . . . [and] sodium, . . . and in the interest of conservation of natural resources, is authorized to waive, suspend, or reduce the rental, or minimum royalty, . . . whenever in his judgment it is necessary to do so in order to promote development, or whenever in his judgment the leases cannot be successfully operated under the terms provided therein. . . .  In the event the Secretary of the Interior, in the interest of conservation, shall direct or shall assent to the suspension of operations and production under any lease granted under the terms of this chapter, any payment of acreage rental or of minimum royalty prescribed by such lease likewise shall be suspended during such period of suspension of operations and production; and the term of such lease shall be extended by adding any such suspension period thereto.

30 U.S.C. § 209.  Leases cannot expire while in suspension.  Id. § 226(i).  The relevant regulations mirror these provisions.  See 43 C.F.R. § 3103.4-4(a) ("A suspension of all operations and production may be directed or consented to by the authorized officer only in the interest of conservation of natural resources."); id. § 3103.4-4(b) ("The term of any lease shall be extended by adding thereto the period of the suspension, and no lease shall be deemed to expire during any suspension."); id. § 3103.4-4(d) ("Rental and minimum royalty payments shall be suspended during any period of suspension of all operations and production directed or assented to by the authorized officer . . . .").[5]

## B.  Federal Land Policy

The other statute relevant in this case is the Federal Land Policy and Management Act of 1976, 43 U.S.C. §§ 1701-1787 (2012), which provides the framework for the federal government's land use planning and management.  Under this Act, the Secretary is authorized to "develop, maintain, and, when appropriate, revise land use plans which provide by tracts or areas for the use of the public lands."  Id. § 1712(a).  The Secretary may delegate these responsibilities to the BLM, id. § 1731, and promulgate rules and regulations to implement the statutory requirements, id. § 1740.

As set forth in the Act's implementing regulations, "[r]esource management plans are designed to guide and control future management actions and the development of subsequent,

---

[5]  Section 3103.4-4 was published in May 1988, 53 Fed. Reg. 17,340, 17,354 (May 16, 1988), after six of the leases at issue were first acquired by one of the plaintiffs, see App., infra.

-5-

more detailed and limited scope plans for resources and uses."[6] 43 C.F.R. § 1601.0-2 (2012). However, a resource management plan "is not a final implementation decision on actions which require further specific plans, process steps, or decisions under specific provisions of law and regulations." Id. § 1601.0-5(n).

The development or revision of a resource management plan is a lengthy, multistep process. See generally id. §§ 1610.4-.5. Broadly summarized, the relevant BLM field office must (1) gather and analyze a wide spectrum of information and data from a variety of sources, id. §§ 1610.4-1 to -4; (2) prepare a draft resource management plan and draft environmental impact statement in which it describes and analyzes resource management alternatives and identifies a preferred alternative, id. §§ 1610.4-5 to -7; (3) review any comments on its draft plan, id. § 1610.4-8; and (4) submit a recommended proposed resource management plan and final environmental impact statement to the appropriate BLM state office, id. §§ 1610.4-8, 1610.5-1. Then, the BLM state office (1) publishes the proposed resource management plan and final environmental impact statement, id.; (2) resolves any protests of the proposed plan, id. §§ 1610.5-1 to -2; and (3) approves the proposed plan in a "concise public record of the decision," id. § 1610.5-1. "All future resource management authorizations and actions" are required to "conform to the approved plan." Id. § 1610.5-4. However, in appropriate circumstances, a resource management plan may be amended to permit a previously prohibited resource use. Id. § 1610.5-5. The amendment process requires, among other things, the preparation of an environmental assessment or an environmental impact statement. Id.

## II. The Pre-August 1991 Landscape and Plaintiffs' Acquisition of Leases

Plaintiff Barlow & Haun, Inc. ("Barlow & Haun") is a Wyoming corporation that, among other things, identifies oil and gas prospects and then markets those prospects to the oil and gas industry for further development. Tr. 72, 1286-87 (Doelger). More particularly, Barlow & Haun's business model involves developing sufficient geologic support to justify exploration and drilling on its leases, and then marketing its findings to the oil and gas industry via prospectuses.[7] Id. at 1286, 1289 (Doelger). Barlow & Haun generally does not act as an operator; rather, its goal is to partner with oil and gas producers to develop the leases.[8] Id. at 1286-87, 1289 (Doelger). In furtherance of its efforts, Barlow & Haun and another plaintiff, TriContinental Resources ("TriContinental"), a Wyoming partnership, began to acquire oil and gas leases in the Green River Basin in southwestern Wyoming, in what has been designated as the Known Sodium Leasing Area ("KSLA"). Jt. Stip. ¶¶ 11, 22. The KSLA derives its name from the presence of trona deposits; trona is the hard component of sodium, Tr. 950 (Murphy),

---

[6] A "resource management plan" is another name for the land use plan described in the Federal Land Policy and Management Act of 1976. See 43 C.F.R. § 1601.0-5(n).

[7] Prospectuses are also known as "blue books." Tr. 1298-98 (Doelger).

[8] However, Barlow & Haun was the operator of a dry hole well at Cedar Mountain. Tr. 1287 (Doelger). As the operator, it "permitted the well, . . . bonded the well, . . . contracted for the rig, [and] managed the operations." Id.

and sodium is a leasable mineral under the Mineral Leasing Act, 30 U.S.C. § 181.  By 1992, the KSLA encompassed approximately 694,000 acres of land, with approximately 400,000 acres owned by the federal government and the remaining acreage owned by the state of Wyoming and Anadarko Petroleum Company ("Anadarko").  Tr. 951-52 (Murphy).

Two BLM field offices are responsible for overseeing activities within the KSLA:  the western portion of the KSLA is administered by the Kemmerer field office and the eastern portion is administered by the Rock Springs field office.  Id. at 3468 (Madrid); DX 102A.  In June 1986, the BLM issued a record of decision approving and adopting a resource management plan covering the land within the Kemmerer field office's area of administration (the "Kemmerer Resource Management Plan").  Jt. Stip. ¶ 16; JX 25.  The record of decision allowed for oil and gas drilling and production, subject to the BLM's regulatory authority.  Jt. Stip. ¶¶ 17-18.  It did not mention any potential conflict with the underground mining of trona.  Id. ¶ 17.  The record of decision remained in effect until 2010.  Id. ¶¶ 19, 57.

The twenty-six leases at issue in this case, which are situated in the KSLA and cover just over 26,000 acres of land, were acquired while the 1986 record of decision was in place, id. ¶¶ 60-81.  Barlow & Haun and TriContinental originally acquired record title interest in sixteen of the leases before August 1991, when the conflict between trona and oil and gas, described below, became evident.  Id. ¶¶ 61, 63-68, 70-77, 80.  They subsequently assigned their interests in all sixteen of these leases to other entities, before Barlow & Haun reacquired record title interest in them in the 2000s.  Id.  Notably, TriContinental has not possessed record title interest in any of the leases at issue since June 1, 2000.  See id. ¶ 61 (noting that TriContinental relinquished its interest in one lease effective June 1, 2000); id. ¶¶ 63-66, 68, 71-74, 76, 80 (noting that TriContinental relinquished its interest in eleven leases effective August 1, 1990).

With respect to the remaining ten leases at issue, Barlow & Haun initially acquired one lease in 1999, four more leases in 2001, and the five remaining leases in 2008.  Id. ¶¶ 60, 62, 69, 78-79, 81.  Barlow & Haun has continuously maintained a 100% record title interest in the leases it acquired in 1999 and 2008, id. ¶¶ 60, 81, but not in the leases it acquired in 2001.  Id. ¶¶ 62, 69, 78-79.  In the appendix, the court identifies each lease, the first date that the lease was acquired by one of the plaintiffs, and the date that Barlow & Haun most recently acquired an interest in the lease.

The relevant provisions of all twenty-six leases are very nearly identical.  For example, all but one of the leases contains the following granting clause:

> [T]his lease is issued granting the exclusive right to drill for, mine, extract, remove and dispose of all the oil and gas . . . in the lands described [herein] . . . . Rights granted are subject to applicable laws, the terms, conditions, and attached stipulations of this lease, the Secretary of the Interior's regulations and formal orders in effect as of lease issuance, and to regulations and formal orders hereafter promulgated when not inconsistent with lease rights granted or specific provisions of this lease.

Id. ¶ 24.  The remaining lease (WYW84463) similarly provides:

> This oil and gas lease is issued for a period of ten (10) years to the above-named lessee pursuant and subject to the provisions of the Mineral Leasing Act and subject to all rules and regulations of the Secretary of the Interior now or hereafter in force, when not inconsistent with any express and specific provisions herein, which are made a part hereof.
>
> . . . .
>
> The lessee is granted the exclusive right and privilege to drill for, mine, extract, remove, and dispose of all the oil and gas . . . in the lands leased . . . .

JX 26 at BH005120-21.  Other similarities include provisions requiring the lessee to pay the United States rentals and royalties, see JX 26, and the lack of any stipulations on oil and gas production related to trona, Jt. Stip. ¶ 26.

Furthermore, all of the leases contain provisions describing the parties' responsibilities regarding operations.  In particular, each lease reserves to the United States the right to control the rates of development and production for the public interest.  See JX 26; see also id. at BH005121 (containing, in lease WYW84463, a more detailed provision indicating that the Secretary, in carrying out the public interest, could "take into consideration, among other things, Federal laws, State laws, and regulations issued thereunder, or lawful agreements among operators regulating either drilling or production, or both").  In addition, each lease requires the lessee to conduct operations in the least intrusive manner possible.  See, e.g., id. at BH003155 (containing provisions, found in twenty-five of the leases, that require the lessee to (1) "conduct operations in a manner that minimizes adverse impacts to the land, air, and water, to cultural, biological, visual, and other resources, and to other land uses or users" and to "take reasonable measures deemed necessary by [the United States] to accomplish" this requirement, and (2) "maintain a safe work environment in accordance with standard industry practices . . . and take measures necessary to protect the health and safety of the public"), BH005121 (providing, in lease WYW84463, that the lessee agrees "to carry on all operations in accordance with approved methods and practice as provided in the Oil and Gas Operating Regulations, having due regard for the prevention of waste of oil or gas or damage to deposits or formations containing oil, gas, or water or to coal measures or other mineral deposits, for conservation of gas energy, for the preservation and conservation of the property for future productive operations, and for the health and safety of workmen and employees").

### III.  The Trona Conflict

In August 1991, Atlantic Richfield Company ("ARCO") submitted an application to the BLM for an oil and gas unit designation for the proposed development of the Overland Trail Unit, a portion of which was located in the KSLA.  Jt. Stip. ¶ 27.  A trona mining company, FMC Wyoming Corporation, received notice of ARCO's application and, concerned with the possibility of concurrent development of oil and gas and trona, lodged a formal protest with the

BLM.  Id. ¶ 28; Tr. 874 (Murphy).  The BLM began to investigate the issue of concurrent development and prepare a regulatory response.  Jt. Stip. ¶ 29.

Because an agreement with the trona mining companies for concurrent development had not been reached and a regulatory response from the BLM was not immediately forthcoming, ARCO requested, in June 1992, that the BLM issue an indefinite suspension of all of its leases located in the KSLA to protect ARCO's investment in the area.  Id. ¶¶ 30-31.  The leases identified by ARCO included seventeen of the twenty-six leases at issue in this case.  Id. ¶ 31.  The BLM granted ARCO's request in part, suspending operations on ARCO's leases from September 1992 through January 1993.  Id. ¶ 32.  Because the situation remained unchanged in January 1993, ARCO requested another indefinite suspension of its leases.  Id. ¶ 33.  The BLM suspended the leases through December 1993.  Id. ¶ 34.

While the negotiations between the oil and gas and trona industries concerning concurrent development continued, the BLM developed its policy response:  the Wyoming Trona/Oil and Gas Conflict Policy ("Conflict Policy").  Id. ¶ 35.  The Conflict Policy was based on the principle of "first in time, first in right."  Id. ¶ 36.  The BLM had developed the Conflict Policy after reviewing input from the oil and gas and trona industries, and securing the approval of all three mineral owners in the KSLA (the BLM, the state of Wyoming, and Anadarko's predecessor, Union Pacific Resources Group, Inc. ("Union Pacific")[9]).  Id.  The BLM disseminated the Conflict Policy to leaseholders in the KSLA and other interested parties in April 1993 for review and comment.  Id.

In August 1993, while the BLM was still soliciting comments, the Petroleum Association of Wyoming, the Trona Section of the Wyoming Mining Association, and Union Pacific formed the Joint Industry Committee ("JIC") to develop an alternative to the Conflict Policy.[10]  Id. ¶ 37.  In response, the BLM decided to table its formal adoption of the Conflict Policy.  Id. ¶ 38.  The JIC, using outside contractors, began to study the issue of concurrent development in an attempt

---

[9]  The relationship between Anadarko and Union Pacific is not accurately stated in the trial record.  See Tr. 952 (Murphy) (describing Anadarko as a subsidiary of Union Pacific).  The court takes judicial notice, pursuant to Rule 201(b)(2) of the Federal Rules of Evidence, that Anadarko acquired Union Pacific in 2000, and that Union Pacific is a subsidiary of Anadarko.  See Press Release, Anadarko Petroleum Corporation, Anadarko and Union Pacific Resources Close Merger (July 14, 2000), http://www.anadarko.com/Investor/Pages/NewsReleases/News Releases.aspx?release-id=104508.

[10]  Subsequently, in April 1995, the JIC formalized its membership and organization in a Participant Agreement.  DX 113.  The signatories to the agreement were Rock Springs Royalty Company; Union Pacific; FMC Corporation; Tg Soda Ash, Inc.; Rhone Poulenc of Wyoming, L.P.; General Chemical (Soda Ash) Partners and Solvay Soda Ash Joint Venture; the Petroleum Association of Wyoming; and the Wyoming Mining Association Trona Subcommittee.  Id.  The agreement also reflected that the BLM and the state of Wyoming intended to participate in the JIC's activities.  Id.

to find a technical solution.  Id. ¶ 39; JX 7.  ARCO once again requested that the BLM indefinitely suspend its leases in the KSLA, and the BLM suspended the leases through January 1995.  Jt. Stip. ¶ 40.

By 1995, the BLM realized that the JIC's development of an alternative to the Conflict Policy would take years to accomplish due to the complex technical investigation required.  Id. ¶ 41.  Thus, in April 1995, it established the Mechanically Mineable Trona Area ("MMTA"), an area encompassing the northeastern portion of the KSLA, within which oil and gas operations and production were suspended for a three-year period–from May 1995 to May 1998.  Id.; JX 7. The BLM extended the suspension for another year in 1998.  Jt. Stip. ¶ 42.  Finally, on April 29, 1999, the JIC Policy Committee submitted its findings to the JIC and the BLM.  Id. ¶ 43.  To allow more time for it to consider the findings, the BLM suspended the leases in the MMTA for another year, through May 1, 2000.  Id. ¶ 44.  Ultimately, the BLM decided to postpone the issuance of a policy regarding concurrent development to permit the peer review of the JIC's findings by Yates Petroleum Corporation ("Yates").  Id. ¶¶ 45-46.  Thus, on April 19, 2000, the BLM suspended all oil and gas leases in the MMTA "indefinitely" pursuant to 30 U.S.C. § 209, 30 U.S.C. § 226(i), and 43 C.F.R. ¶ 3103.4-4.[11]  Id. ¶ 46; JX 11.  All of the leases at issue in this case were included in the suspension.  Compare JX 11 (listing the affected leases), with App. (listing the leases at issue in this case).

The BLM received the Yates report in August 2002.  Jt. Stip. ¶ 48.  Keeping the indefinite suspension in place, the BLM began to evaluate the report, the JIC's recommendations, and input from the various stakeholders.  Id. ¶ 49.  On April 15, 2004, the BLM held a public meeting to present its proposed solution to the oil and gas and trona conflict. Id. ¶ 50; PX 292A.  Specifically, the BLM proposed (1) establishing an Oil-Gas-Trona Management Area ("OGTMA"), an area roughly equivalent to the MMTA; (2) prioritizing conventional trona mining over oil and gas leasing and development within the OGTMA; (3) continuing the indefinite suspension of existing oil and gas leases within the OGTMA; and (4) analyzing, during the Kemmerer Resource Management Plan revision process, a moratorium of further oil and gas leasing within the OGTMA as part of the preferred alternative.  PX 292A. Plaintiffs did not attend the meeting due to a lack of sufficient advance notice, but they did subsequently receive the BLM's presentation materials.  Jt. Stip. ¶ 50.  Not long after the meeting, the BLM opted not to use the OGTMA label, deciding instead to revert to calling the affected area the MMTA.  See Public Comment Notice, 69 Fed. Reg. 42,204 (July 14, 2004); see also PX 109 (noting, in a January 2005 newsletter, that the BLM had changed the name of the area from the OGTMA to the MMTA).

### IV.  Shallow Gas Drilling in the MMTA

While the oil and gas leases in the MMTA remained suspended, an oil and gas operator, Saurus Resources, Inc. ("Saurus"), decided to pursue shallow gas development in the KSLA.

---

[11]  The BLM's suspension letter erroneously refers to 43 C.F.R. ¶ 3103.4-4 as "43 C.F.R. ¶ 3104.4-4."  See 43 C.F.R. pt. 3100 (1999).

DX 22; DX 221; Tr. 159, 1335, 1352 (Doelger). Saurus entered into an agreement to pursue this development with Barlow & Haun and TriContinental on October 1, 1998. DX 22; Tr. 1352 (Doelger). The project included, among other prospects, four suspended leases in the MMTA near a trona mine. DX 22; DX 23. Saurus met with the BLM in October 1998 to discuss its shallow gas drilling proposal. DX 101 at ¶¶ 29-30. Saurus subsequently submitted ten APDs to the BLM related to suspended leases in the MMTA, proposing to drill to shallow depths above an active trona mine. Id. ¶¶ 31, 35. On October 29, 1998, Saurus and Barlow & Haun presented their proposal to the JIC. Id. ¶¶ 32-34; DX 27. The BLM then processed Saurus's APDs, eventually rejecting them on November 17, 1998, due to the ongoing work of the JIC. DX 101 at ¶ 35. However, Saurus continued to negotiate with the trona mining company, and the two eventually reached an agreement on a drilling plan. Id. ¶ 39. The JIC evaluated and approved the agreement as an experimental model. DX 36.

Having obtained approval of its proposed drilling plan, Saurus submitted five new APDs to the BLM in January 2000. DX 101 at ¶ 40. Saurus again indicated its intent to drill to shallow depths above an active trona mine, but proposed the use of new drilling practices. Id. ¶¶ 39-40. The BLM approved the APDs in May 2000, at the same time terminating the suspensions of the relevant leases. Id. ¶ 45.

Once the BLM had approved its APDs and lifted the suspensions, Saurus began its shallow gas drilling. Id. It drilled three wells above the trona mine, but because it encountered noncommercial amounts of gas, it abandoned those wells. Id. ¶ 46; JX 27 at BLMRS02-001985. Saurus allowed these leases to expire pursuant to their terms. DX 101 at ¶ 46. Saurus also drilled four other wells on leases within the MMTA, but none of those wells was proven to be economic. JX 27 at BLMRS02-001985; Tr. 1354 (Doelger). Ultimately, pursuant to the terms of a January 2003 settlement agreement, Saurus assigned its interest in these leases to its investors. DX 64; Tr. 1355 (Doelger). The investors formed two limited liability companies to serve as holding companies for the leases–plaintiffs NOWIO-S, LLC ("NOWIO-S") and NOWIO-V, LLC ("NOWIO-V").[12] DX 64; Tr. 1294 (Doelger), 2011 (Webb). NOWIO-S and

---

[12] In their amended complaint, plaintiffs allege that NOWIO-S and NOWIO-V are "owners" of the oil and gas lease rights at issue in this case. See Am. Compl. ¶¶ 2-3, 5-8. However, in its amended answer, defendant denies that NOWIO-S and NOWIO-V "currently" own such oil and gas lease rights. See Am. Answer ¶¶ 2, 7-8. There was no evidence presented at trial regarding what, if any, record title interest NOWIO-S or NOWIO-V may have held in the leases at issue. Rather, plaintiff's title expert, Ruth Reile, testified that (1) for lease WYW149082, "NOWIO owns 100%" of the operating rights interest "from the surface to the base of the Green River formation"; (2) for lease WYW103501, "plaintiff entities" own 50% of the operating rights interest "from the surface to the base of the Green River . . . formation" and 100% of the operating rights interest "below the base of the Green River formation"; and (3) for the remaining leases, "plaintiff entities" own 100% of the operating rights interest. Tr. 1770-72 (Reile). She further testified that the "plaintiff entities" obtained their operating rights interests on the same dates that Barlow & Haun last acquired record title interest in the leases. Id. at 1773-74 (Reile). Ms. Reile defined "plaintiff entities" as the plaintiffs named in the complaint,

NOWIO-V attempted, with the assistance of Barlow & Haun, to find an operator to replace Saurus, but were unsuccessful.  Tr. 2028, 2034-35, 2038 (Webb).  Barlow & Haun eventually ceased its efforts to locate a new operator, likely between October 2006 and June 2007.  See id. at 2038-40 (Webb); DX 82.

### V.  The Kemmerer Resource Management Plan Revision Process

### A.  The July 2007 Draft Resource Management Plan and Environmental Impact Statement

The BLM formally initiated the process to revise the Kemmerer Resource Management Plan in June 2003.[13]  JX 21 at 1-13.[14]  In July 2007, the BLM issued its Draft Resource Management Plan and Environmental Impact Statement for the Kemmerer Field Office Planning Area.  Jt. Stip. ¶ 53.  The document contained several statements pertinent to the issues in this case.  In the first chapter, which addressed the purpose of and need for a revised resource management plan, the BLM indicated that the revised plan would "recognize valid existing rights."  JX 21 at 1-11.  The BLM described the proposed resource management alternatives in the second chapter of the document, explaining that the alternative designated as the "preferred alternative" was its "preliminary preference," did not "represent a final BLM decision," and could change between the draft and final environmental impact statements "based on comments received on the Draft EIS, new information, or changes in BLM policies or priorities."  Id. at 2-2.  The BLM's preferred alternative provided, with respect to the conflict between oil and gas and trona:

---

id. at 1785 (Reile), but did not explain whether all, or just a subset, of the plaintiffs owned operating rights for each lease.

Ms. Reile's trial testimony is insufficient to establish the interests held by NOWIO-S and NOWIO-V.  Plaintiffs should have entered into a stipulation with defendant regarding their ownership interests prior to trial, or, at trial, presented explicit testimony or documentation demonstrating the precise interests possessed by each entity.  They failed to follow any of these avenues.  No other witness testified regarding the interests held by NOWIO-S and NOWIO-V, and Ms. Reile's expert report, which presumably would have contained this information, is not part of the record.  Thus, all that can be concluded from the evidence presented at trial is that either NOWIO-S or NOWIO-V owns an operating rights interest in lease WYW149082, and that NOWIO-S and NOWIO-V may own operating rights interests in the remaining leases.

[13]  As noted above, the KSLA existed within the boundaries of two BLM field offices–the Kemmerer field office and the Rock Springs field office.  Activities within the Rocks Springs field office's boundary were governed by the Green River Resource Management Plan.  See JX 18.  If necessary, the BLM would amend the Green River Resource Management Plan to conform to the new Kemmerer Resource Management Plan.  Id.; Tr. 424 (Davis).

[14]  JX 21 is the Draft Resource Management Plan and Environmental Impact Statement for the Kemmerer Field Office Planning Area.  All page citations for JX 21 are to the page numbers used in the document.

-12-

> Existing oil and gas leases are suspended in the MMTA; new oil and gas leases are not being issued in the MMTA. . . . [T]he MMTA is administratively unavailable for new fluid mineral leasing until the oil and gas resource can be recovered without compromising the safety of underground miners.

Id. at 2-45.  In addition, the BLM indicated that it had considered an alternative that would have cancelled all existing oil and gas leases, but rejected that alternative without detailed analysis based on the following rationale:  "The BLM must, by law, recognize all valid existing rights."  Id. at 2-5.  In the third chapter of the document, which pertained to the environment affected by the draft plan, the BLM explained the procedure for pursuing oil and gas development:

> After acquiring an oil and gas lease, and prior to development, an application for permit to drill (APD) must be filed with . . . the BLM Kemmerer Field Office if the well is located on a federal oil and gas lease in the planning area. . . .  Once the permit is approved, the company may proceed with drilling according to the applicable oil and gas lease stipulations and any site-specific conditions of approval that are applied to the permit at the time of approval.

Id. at 3-22 to -23.  Finally, in the fourth chapter of the document, which concerned the environmental consequences of the proposed alternatives, the BLM stated:

> In portions of the planning area, conflicts have occurred under all alternatives between oil and gas and trona, and may occur in the future between oil and gas and coal.  Since 2004, the BLM has been working with industries, regulatory agencies, and other land owners to study and resolve technical and safety issues regarding recovery of overlapping oil and gas and trona resources.  The conclusion from the deliberations is that oil and gas development and trona mining are basically incompatible because of the exposure of the underground trona workforce to risks associated with nearby high-pressure gas wells.  The preferred course of action is to administer the area exclusively for trona extraction until conventional trona mining is complete.  Therefore, an area has been designated, the MMTA, in which oil and gas leasing and development are currently prohibited.  No formal decision has yet been made on the management of the oil and gas and trona resources within the MMTA boundary.  This decision will be a part of the revision of the Kemmerer RMP.

Id. at 4-29.

**B.  The August 2008 Proposed Resource Management Plan and Final Environmental Impact Statement**

After receiving input on its draft document, JX 22 at ES-6,[15] the BLM, in August 2008, issued its Proposed Resource Management Plan and Final Environmental Impact Statement for the Kemmerer Field Office Planning Area, Jt. Stip. ¶ 56.  Portions of this document remained unchanged from the draft document, including the statements that all valid existing rights would be recognized, JX 22 at 1-13, 2-5, the passage addressing the status of oil and gas leases in the MMTA, id. at 2-46, and most of the description of the conflict between oil and gas and trona, id. at 4-31.  However, there were some differences.  First, the BLM's preferred alternative was no longer characterized as its "preliminary preference" that could be changed; all language relating to the preliminary nature of the preferred alternative was removed.  Second, the BLM amended its rationale for rejecting the alternative that would have resulted in the cancellation of all oil and gas leases to provide:  "The BLM must, by law, recognize all valid existing rights.  However, the BLM can impose reasonable limits on the manner and pace of development."  Id. at 2-5.  Third, the BLM amended its discussion of the procedure for pursuing oil and gas development to provide:

> Prior to drilling on a federal lease within the planning area, an application for permit to drill (APD) must be filed with . . . the BLM Kemmerer Field Office. . . . Once the permit is approved, the company proceeds with drilling according to the applicable oil and gas lease stipulations and any site-specific conditions of approval (COAs) that are applied to the permit at the time of approval.

> When an oil and gas lease is issued, it constitutes a valid existing right; BLM cannot unilaterally change the terms and conditions of the lease.  Existing leases would not be affected by decisions resulting from this RMP that designate areas administratively unavailable for oil and gas leasing.  New restrictions such as controlled surface use or timing restrictions in the form of stipulations could not be added to an existing lease.  Existing leases would not be terminated until the lease expires.  However, based on site or project-specific environmental analysis, COAs could be applied at the APD and Sundry Notice stage, and at subsequent development stages, to mitigate potential impacts from oil and gas operations within existing lease areas, providing the leaseholder's right to develop the lease remains intact.

Id. at 3-25.  Finally, the BLM deleted the last two sentences of its description of the ongoing conflict between oil and gas and trona, which had indicated that the BLM had not made a "formal decision" concerning the management of the resources within the MMTA.  Compare id. at 4-31, with JX 21 at 4-29.

---

[15]  JX 22 is the Proposed Resource Management Plan and Final Environmental Impact Statement for the Kemmerer Field Office Planning Area.  All page citations for JX 22 are to the page numbers used in the document.

### C.  The May 2010 Record of Decision and Approved Kemmerer Resource Management Plan

In May 2010, after the conclusion of the protest period, JX 23 at 1-1,[16] the BLM issued its Record of Decision and Approved Kemmerer Resource Management Plan, Jt. Stip. ¶ 57. With this document, the BLM approved (with some changes, clarifications, and corrections not pertinent to this case) the resource management plan that it proposed in August 2008, JX 23 at 1-1 to 1-3, and replaced the plan that it had issued in 1986, id. at 1-4; Jt. Stip. ¶ 57.  The BLM reiterated in this document that "valid existing rights" would be recognized.  JX 23 at 2-15.  The BLM also described the existing state of affairs in the MMTA, noting:  "Existing oil and gas leases are suspended in the MMTA.  The MMTA is administratively unavailable for new fluid mineral leasing until the oil and gas resource can be recovered without compromising the safety of underground miners."  Id. at 2-26.

Although Barlow & Haun frequently called the BLM to ascertain when the record of decision would be issued, plaintiffs never participated in the revision process.  Tr. 1656-57, 1688-89 (Easley), 3627 (Madrid).  Moreover, since the BLM issued its record of decision in May 2010, Barlow & Haun has not contacted the BLM to ascertain the effect that the new resource management plan would have on its leases in the MMTA.  Id. at 1688 (Easley).

### VI.  The Current Status of the Leases

The twenty-six leases at issue in this case remained suspended throughout the Kemmerer Resource Management Plan revision process.  See generally App. (listing the leases at issue in this case); JX 11 (listing the leases in the MMTA that were suspended); JX 21 at 2-45 (noting, in the July 2007 planning document, that existing oil and gas leases in the MMTA were suspended); JX 23 at 2-26 (indicating, in the May 2010 record of decision, that oil and gas leases in the MMTA remained suspended).  Although the BLM suspended these leases "indefinitely," JX 11, the suspension was not irreversible.  Indeed, both the BLM and plaintiffs could have taken steps to trigger the lifting of the suspension.

The BLM, pursuant to its regulatory authority, was responsible for monitoring lease suspensions to determine whether they should continue or be terminated.  PX 19 at .31C3; Tr. 3640, 3702 (Madrid).  If the BLM determined that the conditions supporting a lease suspension no longer existed, then it was authorized to terminate the suspension.  PX 19 at .31C3.  The BLM made such a determination in May 2012, when, on its own initiative, it terminated the suspension of two leases at issue in this case that were located outside of the MMTA (leases WYW122215 and WYW122863).  Jt. Stip. ¶ 59; Tr. 3641-42 (Madrid), 3440 (Weaver).

---

[16]   JX 23 is the Record of Decision and Approved Kemmerer Resource Management Plan.  All page citations for JX 23 are to the page numbers used in the document.

-15-

For their part, plaintiffs could have sought the termination of the suspension of the leases at issue by submitting an APD.  See PX 19 at .31C2; Tr. 3643, 3702 (Madrid).  If plaintiffs had submitted an APD, and that APD was approved by the BLM, then the BLM would have lifted the suspension of the pertinent lease.  See PX 19 at .31C2c; Tr. 3643, 3702 (Madrid).  Of course, it may have been difficult for plaintiffs to obtain the BLM's blanket approval of an APD in the MMTA.  Susan Davis, who worked for a trona mining company for eleven years and then as a petroleum engineer for the BLM in the Green River Management Area for seven years, Tr. 415-18 (Davis), testified that BLM personnel, upon receiving the APD, would have immediately advised the trona mining companies of the application, id. at 425-26 (Davis).  Those companies, in turn, would have stated their objections to the APD and, in the words of Ms. Davis, "made the [applicant's] life so miserable it would have been a good recommendation to have [the applicant] pull [its] APD."  Id.; accord id. at 432 (Davis); see also id. at 3945 (Lewis) (remarking that the BLM would not approve oil and gas development where active trona mining was occurring).  Importantly, however, Ms. Davis's testimony does not reflect the BLM's official policy for processing APDs; as set forth above, upon receipt of an APD, the BLM must post a notice of the APD for a thirty-day period of public inspection, consult with the relevant federal surface management agency and other interested parties (such as the trona mining companies that would be affected by the oil and gas drilling described in the APD), conduct an onsite inspection, and then, no later than five business days after the notice period, advise the applicant regarding the status of the APD.  43 C.F.R. § 3162.3-1(g)-(h); 72 Fed. Reg. at 10,334.  Moreover, the obstacles described by Ms. Davis could have been surmounted in appropriate circumstances.  Indeed, the BLM approved five APDs submitted by Saurus for suspended leases in the MMTA, thereby terminating the suspensions.  DX 101 at ¶¶ 40, 45.  Despite the possibility of success, there is no evidence that plaintiffs submitted an APD for any of the leases at issue.  See also Tr. 1690 (Easley) (indicating that there were no requests to lift suspensions in the MMTA after May 2010); id. at 3626 (Madrid) (indicating that there were no requests to lift suspensions in the MMTA after 2004); cf. Tr. 518-19 (Doelger) (asserting that Barlow & Haun, despite its partnership with Saurus in a project where Saurus submitted APDs for leases in the MMTA that were approved by the BLM, had no knowledge prior to this litigation that the BLM would consider an APD in the MMTA).

## PROCEDURAL HISTORY

Barlow & Haun, TriContinental, and NOWIO-S filed a complaint in this court on November 11, 2008, alleging that the BLM, by permanently suspending all oil and gas operations in the MMTA, had (1) taken their interests in a number of oil and gas leases for public use without just compensation in violation of the Fifth Amendment to the United States Constitution and (2) breached both the express provisions of the leases and the implied covenant of good faith and fair dealing.  The case was assigned to the Honorable George W. Miller, Jr.  Defendant moved to dismiss the complaint as barred by the applicable statute of limitations pursuant to RCFC 12(b)(1), or, in the alternative, to dismiss the takings claim as precluded by the existence of contracts between the parties pursuant to RCFC 12(b)(6).  Judge Miller denied defendant's motions.  Barlow & Haun, TriContinental, and NOWIO-S amended their complaint on September 30, 2010, to add a fourth plaintiff, NOWIO-V, and to remove references to six expired leases.

After the close of discovery, the parties cross-moved for summary judgment.  Judge Miller denied the parties' motions in an unreported August 22, 2012 order, and the case was set for trial.  The case was subsequently reassigned to the undersigned, who held trial in Cheyenne, Wyoming from April 15-30 and September 16-17, 2013.  During trial, the court heard testimony and received other evidence related to both liability and damages.  The parties submitted posttrial briefs, and the court heard closing arguments on March 7, 2014.

## THRESHOLD ISSUES

Before reaching the merits of plaintiffs' claims, the court must address two threshold issues raised by defendant.  First, defendant contends that the court lacks jurisdiction over plaintiffs' amended complaint because plaintiffs' claims accrued beyond the applicable limitations period.  Second, defendant contends that the court cannot entertain plaintiffs' amended complaint because none of plaintiffs' claims has ripened.  As explained in more detail below, the court concludes that plaintiffs have satisfied the statute of limitations, but that the only ripe claim presented by plaintiffs is their claim for breach of contract.  This latter conclusion requires the court to address a third threshold issue:  whether TriContinental, NOWIO-S, and NOWIO-V have standing to assert the surviving breach-of-contract claim.  The court concludes that they do not.

## I.  Jurisdiction–Statute of Limitations

Defendant's first contention concerns the statute of limitations.  To fall within the court's jurisdiction, claims against the United States must be "filed within six years after such claim first accrues."  28 U.S.C. § 2501 (2012); see also John R. Sand & Gravel Co. v. United States, 552 U.S. 130, 133-35 (2008) (providing that the limitations period set forth in 28 U.S.C. § 2501 is an "absolute" limit on the ability of the United States Court of Federal Claims to reach the merits of a claim).  "A claim first accrues within the meaning of the statute of limitations when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action."  Brown Park Estates-Fairfield Dev. Co. v. United States, 127 F.3d 1449, 1455 (Fed. Cir. 1997) (internal quotation marks omitted).

Defendant argues that all of plaintiffs' claims accrued no later than May 1, 2000, the effective date of the indefinite suspension of the leases at issue; therefore, plaintiffs' complaint, filed more than eight years later, is time barred.  Notably, defendant unsuccessfully advanced this identical argument before Judge Miller in its motion to dismiss.  See generally Barlow & Haun, Inc. v. United States, 87 Fed. Cl. 428, 434-38 (2009).  The court generally will not reopen issues that have been previously decided in the same case.  Messinger v. Anderson, 225 U.S. 436, 444 (1912).  However, it has the power to do so in "extraordinary circumstances" when, for example, the prior decision is "'clearly erroneous and would work a manifest injustice.'"  Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 817 (1988) (quoting Arizona v. California, 460 U.S. 605, 618 n.8 (1983)); see also Jamesbury Corp. v. Litton Indus. Prods., Inc., 839 F.2d 1544, 1551 (Fed. Cir. 1988) (agreeing that a trial judge considering a motion for summary judgment is not bound by the summary judgment ruling of the trial judge previously

assigned to the case), <u>overruled on other grounds by</u> <u>A.C. Aukerman Co. v. R.L. Chaides Constr.</u>
<u>Co.</u>, 960 F.2d 1020 (Fed. Cir. 1992) (en banc).  Moreover, because the statute of limitations is
a jurisdictional limitation, it may be raised as an issue at any time.  <u>Arbaugh v. Y & H Corp.</u>, 546
U.S. 500, 506 (2006).  As explained below, there is no legal basis to modify Judge Miller's prior
ruling on the statute of limitations.

## A.  Plaintiffs' Claim for Breach of Contract

The court first addresses plaintiffs' breach-of-contract claim.  Normally, in an action for
breach of contract, a claim accrues when the breach occurs.  <u>Holmes v. United States</u>, 657 F.3d
1303, 1317 (Fed. Cir. 2011).  Judge Miller addressed the accrual date of plaintiffs' claim for
breach of contract in his ruling on defendant's motion to dismiss:

> The mere announcement that the Government does not intend to perform its
> contractual obligation is a repudiation, not a breach, and that repudiation does not
> commence the running of the statute of limitations.  Such a repudiation ripens into
> a breach either when the Government actually fails to honor its obligations or
> when the promisee brings suit. . . .  Because the time for the Government's
> performance and a refusal to perform (<u>i.e.</u>, a refusal of a specific request by
> plaintiffs to mine), do[] not appear to have yet taken place, for the limited
> purposes of this motion and for the reasons stated below, the Court construes the
> indefinite suspensions of the leases as a repudiation of the plaintiff[s'] contract
> rights that did not accrue as a breach of contract until the plaintiffs chose to treat
> them as a breach by filing suit.  Thus, the breach of contract claim is timely filed.

<u>Barlow & Haun, Inc.</u>, 87 Fed. Cl. at 436 (citations and internal quotation marks omitted); <u>see</u>
<u>also</u> <u>id.</u> at 437 ("[F]or the purpose[] of considering a motion to dismiss on statute of limitations
grounds, the Court cannot conclude that the resolution of the future state of the oil and gas leases
came to rest on May 1, 2000, since it appears to have been in play at least through 2004.").

Posttrial, plaintiffs allege that the BLM breached the leases at issue by eliminating their
right under the leases to explore for and produce oil and gas, and by imposing new conditions on
the leases–accommodating the concerns of the trona industry and ensuring the safety of
underground trona miners–that were not contemplated at the time that the leases were executed.
Plaintiffs further contend that these breaches resulted from the BLM's indefinite suspension of
the leases–a suspension that was finalized with the issuance of the August 2008 planning
document–and the BLM's approval of a new resource management plan with the May 2010
record of decision.[17]  Both the indefinite suspension and the approval of a new resource

_____

[17]  <u>See, e.g.</u>, Pls.' Posttrial Mem. 33 (contending that the August 2008 planning document
prohibited oil and gas development), 35 (contending that the August 2008 planning document
prohibited oil and gas development and that the May 2010 record of decision did not alter this
prohibition), 41-42 (asserting that the Kemmerer Resource Management Plan approved in 1986,
which contained no restrictions on oil and gas production, was replaced in May 2010 by a

management plan, plaintiffs argue, constituted repudiations of leases, which they opted to treat as breaches by filing suit.  Defendant completely disregards plaintiffs'–and Judge Miller's– treatment of the BLM's actions as repudiations.[18]  Instead, it remains steadfast in its contention that plaintiffs' breach-of-contract claim is premised on the BLM's May 1, 2000 indefinite suspension of the leases, and is therefore barred by the statute of limitations.  Because Judge Miller has already rejected a May 1, 2000 accrual date, and because defendant has not pointed to any evidence or raised any legal argument demonstrating that Judge Miller was incorrect in concluding that plaintiffs' claim for breach of contract accrued when they filed suit in 2008, the court will not disturb Judge Miller's holding that plaintiffs' breach-of-contract claim was timely filed.

### B. Plaintiffs' Takings Claim

Defendant also contends that plaintiffs' Fifth Amendment takings claim is untimely. Because "[a] claimant under the Fifth Amendment must show that the United States, by some specific action, took a private property interest for a public use without just compensation," a Fifth Amendment takings claim "accrues when that taking action occurs."  Alliance of Descendants of Tex. Land Grants v. United States, 37 F.3d 1478, 1481 (Fed. Cir. 1994) (citation omitted); accord Ingrum v. United States, 560 F.3d 1311, 1314 (Fed. Cir. 2009) ("[A] claim alleging a Fifth Amendment taking accrues when the act that constitutes the taking occurs.").

In its motion to dismiss, defendant argued that plaintiffs' takings claim accrued no later than May 1, 2000, the effective date of the BLM's indefinite suspension of the leases at issue, because no government action affecting plaintiffs' rights under the leases occurred after that date.  Plaintiffs responded by arguing that their takings claim could not have accrued before 2007 because up until that time, the BLM continued to represent that no final decision had been made regarding the oil and gas and trona conflict.  In his ruling, Judge Miller noted that he was unable to "conclude that the resolution of the future state of the oil and gas leases came to rest on May 1, 2000, since it appears to have been in play at least through 2004."  Barlow & Haun, Inc., 87 Fed. Cl. at 437.  In other words, there had been no final decision from the BLM regarding plaintiffs' ability to pursue oil and gas development under the leases.  Id. at 436-37.  As a result, Judge Miller explained, he was unable to conclude that the facts presented demonstrated that the

---

resource management plan that prohibited oil and gas production until all trona mining was complete), 67 (characterizing the August 2008 planning document as a repudiation).

[18]  Indeed, these actions must be characterized as repudiations rather than as breaches by nonperformance.  Compare Restatement (Second) of Contracts § 235(2) (1981) (indicating that nonperformance of a contractual duty when due constitutes a breach of contract), with id. § 250(a) (defining repudiation as a statement indicating that a party will commit a breach).  The BLM's suspension of the leases and subsequent adoption of a new resource management plan were not failures to perform obligations that had become due under the leases.  Rather, these actions pertained to the BLM's future performance under the leases.

dismissal of plaintiffs' takings claim on statute of limitations grounds was warranted as a matter of law.  Id. at 437.

Posttrial, plaintiffs contend that the BLM effected a taking of the leases at issue by placing on them the burden of protecting the trona industry and the underground trona miners, thereby effectively prohibiting the oil and gas development allowed under the leases.  They further assert that the taking occurred either in August 2008–the date they allege that the BLM's indefinite suspension of the leases became a final decision–or in May 2010–the date that the BLM approved a new resource management plan.  To avoid addressing plaintiffs' two alternative accrual dates head-on, defendant mischaracterizes the accrual date alleged by plaintiffs,[19] and makes no attempt to explain why Judge Miller's decision was factually or legally improper.  Accordingly, the court will not disturb Judge Miller's holding that plaintiffs' takings claim was timely filed.

## II. Justiciability

Even if the court possesses jurisdiction to entertain a claim, "the existence of jurisdiction does not confirm the court's ability to supply relief."  Murphy v. United States, 993 F.2d 871, 872 (Fed. Cir. 1993).  Plaintiffs must also establish that their claims are justiciable.  Id.; see also Fisher v. United States, 402 F.3d 1167, 1176 (Fed. Cir. 2005) (panel portion) (noting that justiciability "encompasses a number of doctrines under which courts will decline to hear and decide a cause," including the "doctrines of standing, mootness, ripeness, and political question").  The court's inquiry into the justiciability of a case is distinct from its inquiry into whether it has jurisdiction over the case's subject matter.  See Powell v. McCormack, 395 U.S. 486, 512 (1969) ("[T]here is a significant difference between determining whether a federal court has 'jurisdiction of the subject matter' and determining whether a cause over which a court has subject matter jurisdiction is 'justiciable.'" (citing Baker v. Carr, 369 U.S. 186, 198 (1962)));  Murphy, 993 F.2d at 872 ("Justiciability is distinct from jurisdiction[.]").  In other words, the court may find that it possesses jurisdiction over the subject matter of a claim but that the dispute is nevertheless nonjusticiable.[20]

_____

[19]  "Plaintiffs plainly assert that the May 2000 indefinite suspension constituted a taking." Def.'s Br. 71.

[20]  In such cases, the claim should be dismissed as nonjusticiable and not for lack of subject matter jurisdiction.  See, e.g., Baker, 369 U.S. at 196 (holding that a case that is "unsuited to judicial inquiry or adjustment" should be dismissed for "a failure to state a justiciable cause of action" and not for "a lack of jurisdiction of the subject matter" (internal quotation marks omitted));  Oryszak v. Sullivan, 576 F.3d 522, 526-27 (D.C. Cir. 2009) (Ginsburg, J., concurring) (noting that when "a plaintiff makes a claim that is not justiciable . . . a court should dismiss the case for failure to state a claim" and that "it is important to distinguish among failure to state a claim, a claim that is not justiciable, and a claim over which the court lacks subject matter jurisdiction");  F. Alderete Gen. Contractors, Inc. v. United States, 715 F.2d 1476, 1480 (Fed. Cir. 1983) (reciting "the long-standing rule in the Federal courts that jurisdiction is determined at the time the suit is filed and, after vesting, cannot be ousted by

## A. Ripeness

A claim is not ripe for judicial review when it is contingent upon future events that may or may not occur.  Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 580-81 (1985).  The ripeness doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."  Abbott Labs. v. Gardner, 387 U.S. 136, 148-49 (1967), overruled on other grounds by Califano v. Sanders, 430 U.S. 99 (1977).  The doctrine generally derives "from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction."  Reno v. Catholic Soc. Servs., Inc., 509 U.S. 43, 57 n.18 (1993).  However, when "[t]he ripeness inquiry concerns whether [a plaintiff] ripened his regulatory takings claim by exhausting his administrative remedies," the inquiry is prudential in nature.  McGuire v. United States, 707 F.3d 1351, 1358-59 (Fed. Cir. 2013) (citing Suitum v. Tahoe Reg'l Planning Agency, 520 U.S. 725, 734 (1997); Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982)).

### 1. Plaintiffs' Claim for Breach of Contract

Defendant first contends that plaintiffs' breach-of-contract claim is not ripe for adjudication.  However, as noted by plaintiffs, all of the case law cited by defendant in support of its contention relates to when a takings claim ripens.  The standard is different for breach-of-contract claims, which ripen when the breach occurs because that is the time when the nonbreaching party is entitled to bring suit.  See Nager Elec. Co. v. United States, 368 F.2d 847, 851-52 (Ct. Cl. 1966) ("For contract cases, . . . normally the cause of action first accrues, and the statute begins to run, when the work is completed or the items delivered (and accepted), or the services rendered, or (if the contract was never completed) when the breach became total.  That was considered to be the time when the contractor could ordinarily demand his money and bring his suit if payment was not made.").  Moreover, where a party has repudiated a contract, a claim for breach of contract ripens when performance becomes due or when the other party to the contract opts to treat the repudiation as a present total breach.  See id. (indicating that where "the contract was never completed," a party could sue for breach of contract "when the breach became total"); Franconia Assocs. v. United States, 536 U.S. 129, 143 (2002) (noting that "a repudiation ripens into a breach" at the time performance is due or when the nonrepudiating party chooses to treat the repudiation as a breach); Plaintiffs in Winstar-Related Cases v. United States, 37 Fed. Cl. 174 (1997) (holding that certain plaintiffs' contract claims did not ripen at the time that the relevant statute was enacted because the statutory enactment constituted an

_____

subsequent events, including action by the parties" (emphasis added)); see also Kontrick v. Ryan, 540 U.S. 443, 455 (2004) ("Clarity would be facilitated if courts and litigants used the label 'jurisdictional' . . . only for prescriptions delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction) falling within a court's adjudicatory authority.").

anticipatory breach), aff'd, Ariadne Fin. Servs. Pty. Ltd. v. United States, 133 F.3d 874 (Fed. Cir. 1998).

As noted above, plaintiffs allege that the BLM repudiated the leases at issue by suspending the leases indefinitely and by issuing a new resource management plan, but that those repudiations did not constitute breaches until they chose to treat them as present breaches when they filed suit. Under the applicable case law, plaintiffs' claim for breach of contract was ripe as of the date they filed suit.

## 2. Plaintiffs' Takings Claim

The ripeness analysis for plaintiffs' takings claim is not as straightforward. Defendant argues that plaintiffs' takings claim is not ripe for adjudication because plaintiffs have not availed themselves of the BLM's regulatory process for obtaining permission to pursue oil and gas development under the leases at issue. "[A] claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 186 (1985); accord Palazzolo v. Rhode Island, 533 U.S. 606, 620-21 (2001) ("[A] landowner may not establish a taking before a land-use authority has the opportunity, using its own reasonable procedures, to decide and explain the reach of a challenged regulation. Under our ripeness rules a takings claim based on a law or regulation which is alleged to go too far in burdening property depends upon the landowner's first having followed reasonable and necessary steps to allow regulatory agencies to exercise their full discretion in considering development plans for the property, including the opportunity to grant any variances or waivers allowed by law."); MacDonald, Sommer & Frates v. Yolo Cnty., 477 U.S. 340, 348 (1986) ("It follows from the nature of a regulatory takings claim that an essential prerequisite to its assertion is a final and authoritative determination of the type and intensity of development legally permitted on the subject property."); Boise Cascade Corp. v. United States, 296 F.3d 1339, 1351 (Fed. Cir. 2002) (explaining that "[t]he rule that a taking does not ripen unless a permit is applied for and denied" has been "consistently followed"). For an agency action to be final, two conditions must be met: "First, the action must mark the 'consummation' of the agency's decisionmaking process–it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" Bennett v. Spear, 520 U.S. 154, 177-78 (1997), quoted in NSK Ltd. v. United States, 510 F.3d 1375, 1385 (Fed. Cir. 2007); see also Cooley v. United States, 324 F.3d 1297, 1302 (Fed. Cir. 2003) ("A permit denial is final when the applicant has no appeal mechanism available and the denial is based on an unchanging fact."); id. at 1303 (noting that the finality of a permit denial was not altered by the government's "courteous, but ineffectual invitation" to the plaintiff "to submit more information if it wished to continue to pursue a permit"). However, an agency's "purposeful bureaucratic delay and obfuscation" in the permitting process will not prevent a court from finding the existence of a final decision. Bayou des Familles Dev. Corp. v. United States, 130 F.3d 1034, 1038 (Fed. Cir. 1997); accord Palazzolo, 533 U.S. at 621 ("Government authorities . . . may not burden property by imposition of repetitive or unfair land-use procedures in order to avoid a final decision.").

In the regulatory takings context, a final decision is necessary because it establishes, with sufficient certainty, what limitations, if any, the agency will place on the property.  Morris v. United States, 392 F.3d 1372, 1376 (Fed. Cir. 2004); accord Palazzolo, 533 U.S. at 621  ("As a general rule, until the[] ordinary [administrative] processes have been followed the extent of the restriction on property is not known and a regulatory taking has not yet been established."); MacDonald, 477 U.S. at 348 ("A court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes."); Williamson, 473 U.S. at 191 (remarking that "the factors of particular significance" in the regulatory takings inquiry "cannot be evaluated until the administrative agency has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question").  Thus, "when an agency provides procedures for obtaining a final decision, a takings claim is unlikely to be ripe until the property owner complies with those procedures."  Morris, 392 F.3d at 1376; see also United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 127 (1985) ("A requirement that a person obtain a permit before engaging in a certain use of his or her property does not itself 'take' the property in any sense:  after all, the very existence of a permit system implies that permission may be granted, leaving the landowner free to use the property as desired.").

There is no dispute in this case that a permitting process exists and that under the leases at issue, plaintiffs cannot pursue oil and gas development without first obtaining a permit.  Indeed, the permitting process–which entails the filing, and the BLM's approval, of an APD prior to exploration and development–is longstanding and well known by the oil and gas industry.  It is also undisputed that plaintiffs, who were keenly aware of the permitting process, never took the first step to obtain approval–the submission of an APD to the BLM–to develop any of the leases.  Because plaintiffs never sought the required permit, the BLM has not had the opportunity to review a complete APD, post the APD for the thirty-day period of public inspection, and then render a final decision demonstrating how it would apply its land use regulations–i.e., the relevant resource management plan–to the leases.  In the absence of such a final decision, plaintiffs' takings claim is unripe.

Plaintiffs seek to avoid this result by arguing that their takings claim is ripe because they have established the futility of submitting an APD.  The futility of complying with applicable administrative procedures has been recognized as an exception to the ripeness doctrine in takings cases.  See, e.g., Palazzolo, 533 U.S. at 622 (stating that the "[r]ipeness doctrine does not require a landowner to submit applications for their own sake" and explaining that applications are required only when "there is uncertainty as to the land's permitted use"); The Stearns Co. v. United States, 396 F.3d 1354, 1358 (Fed. Cir. 2005) (holding that where there are two mechanisms by which a property owner may obtain a permit to conduct surface mining and the property owner only avails itself of one of those mechanisms, the property owner's "decision to avoid the remaining administrative procedures can[not] be excused as futile"); Cooley, 324 F.3d at 1302 ("[A] claimant can show its claim was ripe with sufficient evidence of the futility of further pursuit of a permit through the administrative process."); Benchmark Res. Corp. v. United States, 74 Fed. Cl. 458, 469 (2006) ("[P]laintiffs have not provided evidence sufficient to demonstrate futility of application to the [Office of Surface Mining Reclamation and Enforcement] regarding coal mining operations over the whole Property.").  In this case,

plaintiffs argue that in the August 2008 planning document, as approved in the May 2010 record of decision, the BLM made it clear that there would be no oil and gas development in the MMTA until all trona mining had been completed.  However, as explained below, plaintiffs' interpretation of the two documents is too narrow.  As a result, the futility exception to the ripeness requirement does not provide them with relief.

According to precedent binding on this court, a plaintiff cannot invoke the futility exception to the ripeness requirement unless it has already availed itself of the relevant agency's regulatory process.  In Palazzolo, the United States Supreme Court held that when an "agency charged with enforcing a challenged land-use regulation entertains an application from an owner and its denial of the application makes clear the extent of development permitted," and when the owner has otherwise complied with the pertinent regulations, "federal ripeness rules do not require the submission of further and futile applications with other agencies."  533 U.S. at 625-26.  Similarly, the United States Court of Appeals for the Federal Circuit ("Federal Circuit") has held that "the futility exception simply serves 'to protect property owners from being required to submit multiple applications when the manner in which the first application was rejected makes it clear that no project will be approved.'"  Howard W. Heck, & Assocs., Inc. v. United States, 134 F.3d 1468, 1472 (Fed. Cir. 1998) (quoting S. Pac. Transp. Co. v. City of L.A., 922 F.2d 498, 504 (9th Cir. 1990) (emphasis added)); accord McGuire, 707 F.3d at 1361-62; Estate of Hage v. United States, 687 F.3d 1281, 1287-88 (Fed. Cir. 2012) (rejecting the plaintiff's contention that applying for a special use permit to maintain its irrigation ditches would be futile because, among other reasons, the plaintiff's only permit-related disputes with the Forest Service concerned its grazing permits, not its special use permits); Morris, 392 F.3d at 1376 (quoting Heck, and explaining that if "further administrative process could reasonably result in a more definitive statement of the impact of the regulation, the property owner is generally required to pursue that avenue of relief before bringing a takings claim," but "where the agency's decision makes clear that pursuing remaining administrative remedies will not result in a differing outcome, the remaining remedies are futile and the impact of the regulation on the use of the property is reasonably certain"); George E. Warren Corp. v. United States, 341 F.3d 1348, 1351 (Fed. Cir. 2003) ("Futility occurs where the filing party already knows that the agency would deny its claim because the agency has already done so."); Cooley, 324 F.3d at 1302-03 ("After a final decision, an applicant need not submit further applications. . . . Submitting a new application is futile when unchanging facts and applicable law preclude a permit.").  The only exception to the requirement that an application be submitted prior to asserting futility in a judicial proceeding, the Federal Circuit has explained, is when "the administrative entity has no discretion regarding the regulation's applicability and its only option is enforcement" because "in such circumstances, no uncertainty remains regarding the impact of the regulation, certainty being the basis for the ripeness requirement."  Greenbrier v. United States, 193 F.3d 1348, 1359 (Fed. Cir. 1999) (citation omitted); accord Palazzolo, 533 U.S. at 620 ("While a landowner must give a land-use authority an opportunity to exercise its discretion, once it becomes clear that the agency lacks the discretion to permit any development, or the permissible uses of the property are known to a reasonable degree of certainty, a takings claim is likely to have ripened."); Anaheim Gardens v. United States, 444 F.3d 1309, 1316 (Fed. Cir. 2006) ("[A] claimant need not obtain a final decision if the agency lacks any discretion to avoid the allegedly offending regulatory action, or if the record shows, with a reasonable degree of certainty, the remaining

permissible uses of the property after the regulatory action because there can be no variance from the facial requirements of the applicable regulation.").

Here, the BLM retained the discretion to allow oil and gas development in appropriate circumstances.  In its August 2008 planning document, the BLM noted that an APD must be submitted to pursue oil and gas development under a federal lease.  It further explained that it would recognize all valid existing rights, that existing leases would not be affected by the new resource management plan, and that it would use site-specific conditions of approval to mitigate the adverse effects of oil and gas development.  The BLM did note that all existing oil and gas leases in the MMTA were suspended and that its preferred course of action was to administer the KSLA exclusively for trona mining.  However, the suspensions benefitted leaseholders by prolonging the life of the leases and excusing their payment obligations.  And, the BLM's preferred alternative reflected its recognition that existing leases could not be unilaterally altered by a new resource management plan–the BLM stated that it would not issue new leases until the safety of underground trona miners could be ensured, but did not affirmatively or impliedly state that it would deny APDs for existing leases.

The BLM's May 2010 record of decision was more succinct.  In that document, the BLM formally adopted its preferred alternative, which provided that existing oil and gas leases in the MMTA were currently suspended, and that new leasing would not be permitted until it was certain that the safety of underground miners would not be compromised.[21]  It also reiterated that it would recognize valid existing rights.

Taken together, the August 2008 and May 2010 planning documents reflect the BLM's intent to honor the rights of existing leaseholders to develop their leases, and that the BLM's approval of an APD, or any conditions that the BLM appended to a drilling permit, would be based on a site-specific analysis.  Of course, merely because the BLM has the discretion to approve oil and gas development in the MMTA under the new resource management plan does not mean that it will ultimately choose to exercise that discretion by approving an APD.  But, so long as the BLM retained the discretion to approve an APD, plaintiffs were required to submit one.[22]  See Palazzolo, 533 U.S. at 620; Anaheim Gardens, 444 F.3d at 1316; Greenbrier, 193

_____

[21]  Plaintiffs do not and cannot argue that any of the leases at issue constitute "new" leases.

[22]  It bears noting that the evidence in the record reflects that the BLM actually approved APDs in the MMTA during the period in which all oil and gas leases were suspended.  As described above, in May 2000, the BLM approved APDs, and lifted the suspensions of the pertinent leases, to allow Saurus to pursue shallow gas development in the MMTA.  Given that the status quo has not changed since May 2000 (existing oil and gas leases in the MMTA remain suspended), the fact that the BLM was willing to entertain and approve APDs in the MMTA supports the contention that the BLM has the discretion to allow oil and gas development in the MMTA.  See also Heck, 134 F.3d at 1468 (noting that a futility argument can be rejected when there is evidence that an agency has previously granted permits).

F.3d at 1359.  Because plaintiffs have not submitted an APD, they cannot invoke the futility exception to the ripeness requirement.

In sum, plaintiffs' failure to submit an APD is fatal to both their ripeness argument in general, and their attempt to invoke the futility exception to the ripeness requirement more specifically.  Accordingly, plaintiffs' takings claim is not ripe and must be dismissed.

## B.  Standing

As a result of the court's conclusion that the only claim ripe for adjudication is plaintiffs' claim for breach of contract, the court must address whether all four plaintiffs have standing to assert such a claim.  The Tucker Act explicitly recognizes that an express or implied contract with the United States can provide the basis for jurisdiction in this court.  28 U.S.C. § 1491(a)(1).  However, for a plaintiff to maintain a claim for breach of contract under the Tucker Act, "there must be privity of contract between the plaintiff and the United States." [23]  Cienega Gardens v. United States, 194 F.3d 1231, 1239 (Fed. Cir. 1998); accord First Annapolis Bancorp, Inc. v. United States, 644 F.3d 1367, 1373 (Fed. Cir. 2011) ("A plaintiff must be in privity with the United States to have standing to sue the sovereign on a contract claim.").

The evidence presented at trial reflects that Barlow & Haun, the current record title holder of the leases at issue, was the only plaintiff in privity with the United States when the breach-of-contract claim accrued in 2008.  The last date that TriContinental possessed record title interest in any of the leases at issue was June 1, 2000, well outside of the six-year limitations period.  And, there is no evidence that NOWIO-S and NOWIO-V have, or ever had, a contractual relationship with the United States with respect to any of the leases at issue.  Accordingly, TriContinental, NOWIO-S, and NOWIO-V lack standing to sue for breach of contract and must be dismissed from this action.

## BREACH OF CONTRACT

Having disposed of the threshold issues, the court turns to the merits of Barlow & Haun's sole surviving claim–its claim for breach of contract.  As noted above, Barlow & Haun alleges that the BLM breached the leases at issue by eliminating its right under the leases to explore for and produce oil and gas, and by imposing new conditions on the leases–accommodating the concerns of the trona industry and ensuring the safety of underground trona miners–that were not

---

[23]  There are several exceptions to this general rule.  See First Hartford Corp. Pension Plan & Trust v. United States, 194 F.3d 1279, 1289 (Fed. Cir. 1999).  These exceptions include suits by intended third-party beneficiaries, suits by subcontractors "by means of a pass-through suit when the prime contractor is liable to the subcontractor for the subcontractor's damages," and suits by government contract sureties "for funds improperly disbursed to a prime contractor." Id.  "[T]he common thread that unites these exceptions is that the party standing outside of privity by contractual obligation stands in the shoes of a party within privity." Id.  None of these exceptions is applicable in this case.

contemplated at the time that the leases were executed.[24]  These allegations are premised on the BLM's indefinite suspension of the leases, which, according to Barlow & Haun, was finalized with the issuance of the August 2008 planning document, and the BLM's approval of a new resource management plan in May 2010.  Each of the BLM's actions, Barlow & Haun contends, constituted a repudiation of the leases.

"To recover for breach of contract, a party must allege and establish:  (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach."  San Carlos Irrigation & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989); see also Trauma Serv. Grp. v. United States, 104 F.3d 1321, 1325 (Fed. Cir. 1997) ("To prevail, [plaintiff] must allege facts showing both the formation of an express contract and its breach.").  The parties agree that the leases at issue constitute valid contracts between Barlow & Haun and the United States.  However, they have not reached a similar consensus regarding the remaining elements of Barlow & Haun's breach claim.

## I. The BLM's Contractual Duties

Implicit in Barlow & Haun's claim for breach of contract is the assumption that the BLM possessed duties under the leases at issue that it repudiated.  Although Barlow & Haun has the burden to demonstrate all elements of its claim, San Carlos Irrigation & Drainage Dist., 877 F.2d at 959, it does not identify the precise duties that the BLM repudiated.  Nevertheless, based on its allegations that the BLM both extinguished, and imposed new conditions on, its right to explore

---

[24]  In their amended complaint, plaintiffs allege that the BLM breached the leases at issue by violating the implied covenant of good faith.  Am. Compl. ¶ 28.  However, the only evidence regarding good faith elicited by plaintiffs at trial concerned whether the BLM acted in good faith by issuing the leases in the first place–an issue of contract formation, not contract performance.  See Tr. 430-35 (Davis), cited in Pl.'s Posttrial Mem. 43.  Moreover, in their pretrial and posttrial memoranda, plaintiffs fail to discuss, much less cite, the three recent, significant decisions from the Federal Circuit addressing the implied duty of good faith and fair dealing:  Precision Pine & Timber, Inc. v. United States, 596 F.3d 817 (Fed. Cir. 2010); Scott Timber Co. v. United States, 692 F.3d 1365 (Fed. Cir. 2012); and Metcalf Construction Co. v. United States, 742 F.3d 984 (Fed. Cir. 2014).  Thus, the court concludes that plaintiffs abandoned their allegation that the BLM breached the covenant of good faith.  See RCFC App. A ¶ 14(a)(2) (requiring a plaintiff's pretrial memorandum to include "a statement of the issues of fact and law to be resolved by the court," and providing that "[t]he issues should be set forth in sufficient detail to enable the court to resolve the case in its entirety by addressing each of the issues listed"); Palumbo v. United States, 113 F. Supp. 450, 453 (Ct. Cl. 1953) (explaining that the court would only address "claims upon which evidence was introduced" at trial); Thermalon Indus., Ltd. v. United States, 51 Fed. Cl. 464, 470 n.3 (2002) ("Plaintiff has abandoned its claim for consequential damages, presenting no evidence at trial as to these damages and making no mention of them in its post-trial brief."); see also Rosco, Inc. v. Mirror Lite Co., 304 F.3d 1373, 1382 (Fed. Cir. 2002) (agreeing that a claim that was addressed in a posttrial brief had not been abandoned).

for and produce oil and gas, it is apparent that there are two main contractual duties implicated in its claim:  (1) the BLM's obligation to provide Barlow & Haun with the exclusive right to explore for and develop oil and gas on the lands described in the leases and (2) the BLM's obligation to consider Barlow & Haun's APDs pursuant to the pertinent statutes and regulations. The court therefore turns to Barlow & Haun's contention that the BLM breached the leases by repudiating these obligations.

## II. The BLM Did Not Repudiate Its Contractual Obligations

As noted above, Barlow & Haun contends that the BLM anticipatorily repudiated the leases at issue by finalizing the indefinite suspension of the leases in its August 2008 planning document and by approving a new resource management plan in May 2010.  An anticipatory repudiation occurs when a party renounces a contractual duty before performance is due. Franconia Assocs., 536 U.S. at 143.  The renunciation often takes the form of a statement by a contracting party indicating that it will commit a breach that would give the other contracting party a claim for damages for total breach.  See id. (citing Restatement (Second) of Contracts § 250); Mobil Oil Exploration & Producing Se., Inc. v. United States, 530 U.S. 604, 608 (2000). "A mere assertion that the party will be unable, or will refuse to perform his contract is not sufficient; it must be a distinct and unequivocal absolute refusal to perform the promise . . . ." Smoot's Case, 82 U.S. 36, 48 (1872) (internal quotation marks omitted); accord Dow Chem. Co. v. United States, 226 F.3d 1334, 1344 (Fed. Cir. 2000) (holding that the repudiating party's refusal to perform its duties under the contract must "communicate that refusal distinctly and unqualifiedly to the other party").  And, the breach must be total, i.e., one "that 'so substantially impairs the value of the contract to the injured party at the time of the breach that it is just in the circumstances to allow him to recover damages based on all his remaining rights to performance.'"  Mobil Oil, 530 U.S. at 608 (quoting Restatement (Second) of Contracts § 243).

As Barlow & Haun notes, the August 2008 planning document, which contained the proposed resource management plan and the final environmental impact statement, indicated that the BLM's "preferred course of action [was] to administer the [planning] area exclusively for trona extraction until conventional trona mining [was] complete."  JX 22 at 4-31.  This statement, Barlow & Haun contends, constitutes the BLM's definitive refusal to honor the twenty-six leases at issue.  There are two problems with Barlow & Haun's contention.  First, the quoted statement reflects the BLM's "preferred," not its chosen, course of action.  It therefore could not constitute an unequivocal refusal to perform.

Second, and more importantly, the August 2008 planning document contains multiple statements reflecting the BLM's intent to honor existing oil and gas leases.  For example, the BLM represented that under the proposed resource management plan, it would "recognize valid existing rights."  Id. at 1-13; accord id. at 2-5.  And, the BLM indicated that lessees could pursue the development of oil and gas on their leaseholds by submitting an APD, further explaining:

> When an oil and gas lease is issued, it constitutes a valid existing right; BLM cannot unilaterally change the terms and conditions of the lease.  Existing leases would not be affected by decisions resulting from this RMP that designate

areas administratively unavailable for oil and gas leasing.  New restrictions such
as controlled surface use or timing restrictions in the form of stipulations could
not be added to an existing lease.  Existing leases would not be terminated until
the lease expires.  However, based on site or project-specific environmental
analysis, [conditions of approval] could be applied at the APD and Sundry Notice
stage, and at subsequent development stages, to mitigate potential impacts from
oil and gas operations within existing lease areas, providing the leaseholder's
right to develop the lease remains intact.

Id. at 3-25.  These statements certainly cannot be characterized as an absolute refusal to perform
contractual duties.  Rather, they support the BLM's position that it would perform its obligations
under existing leases by reviewing APDs submitted by its lessees.  Therefore, the August 2008
planning document cannot constitute a repudiation of Barlow & Haun's leases.

        In the May 2010 record of decision, the BLM approved the resource management plan
that it proposed in the August 2008 planning document.  Although it noted that "[e]xisting oil
and gas leases are suspended in the MMTA" and that it would not issue new leases "until the oil
and gas resource can be recovered without compromising the safety of underground miners," JX
23 at 2-26, the BLM made it clear that it would recognize "valid existing rights," id. at 2-15.
The May 2010 record of decision does not contain any statement that could be characterized as
BLM refusing to perform its obligations under existing oil and gas leases.  Rather, the document
reflects the exact opposite.  Therefore, it cannot constitute a repudiation of Barlow & Haun's
leases.

        Barlow & Haun's contention that the BLM repudiated the leases at issue is based solely
on the statements made by the BLM in the August 2008 and May 2010 planning documents.
Barlow & Haun neither alleges, nor elicited any evidence at trial, that the BLM otherwise
advised it, either through direct communications or by adopting new regulations, that it would
not perform its contractual obligations.  Indeed, the trial record reflects that Barlow & Haun
remained entitled to pursue oil and gas development under its leases by submitting an APD, and
that the BLM remained committed to reviewing APDs pursuant to the process set forth in its
regulations.  Moreover, those regulations, which were incorporated into all of the leases at issue,
allow the BLM to condition its approval of an APD on the applicant taking measures to
minimize adverse impacts on other resources, uses, and users.  Thus, any representation by the
BLM that it would consider the impact that oil and gas drilling at a particular site would have on
trona mining and miners could not constitute a repudiation of the leases.  More than that is
needed.

### III.  Absent a Repudiation, There Is No Valid Claim for Breach of Contract

        As noted above, Barlow & Haun does not allege that the BLM failed to perform under
the leases at issue.  Rather, Barlow & Haun's claim for breach of contract is premised on the
BLM's purported repudiation of the leases, which it chose to treat as a breach by filing suit.
Barlow & Haun's approach was born of necessity.  The BLM had not actually failed to perform a
presently due contractual obligation prior to plaintiffs filing suit.  Further, a claim that the

indefinite suspension of the leases themselves constituted a failure to perform (rather than a repudiation) would likely run afoul of the statute of limitations because the suspension commenced more than six years before plaintiffs filed suit.  And, a claim that the imposition of new conditions on the leases constituted a failure to perform (rather than a repudiation) is problematic because the BLM possesses the authority to impose conditions on development.

Lacking a valid claim for breach of contract by nonperformance, Barlow & Haun was left with its allegations that the BLM breached the leases by repudiating them.  However, Barlow & Haun has not established that the BLM repudiated the leases.  It therefore cannot prevail on its breach-of-contract claim.  Consequently, there is no need for the court to consider the evidence adduced at trial regarding damages.

### CONCLUSION

Barlow & Haun undoubtedly faces an uphill battle in developing the leases at issue in this case.  The BLM has clearly decided to prioritize the recovery of trona over the recovery of oil and gas in the MMTA.  However, the law is clear that the submission of an APD is a necessary prerequisite to a successful takings claim and that an unequivocal refusal to review an APD– whether before or after its submission–is a necessary prerequisite to a claim for breach of contract by repudiation.  Barlow & Haun has failed to make the required showings, compelling the court to find in defendant's favor.

For the reasons stated, the court **DISMISSES** plaintiffs' takings claim as unripe.  In addition, the court **DISMISSES** the breach-of-contract claim asserted by TriContinental, NOWIO-S, and NOWIO-V for lack of standing.  And, the court **DISMISSES** Barlow & Haun's claim for breach of contract **WITH PREJUDICE**.  No costs.  The clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge

**APPENDIX**

| Lease No. | Interest First Acquired | | | Interest Last Acquired | | |
|---|---|---|---|---|---|---|
| | Owner* | % of Record Title Interest Owned | Date Interest First Acquired** | Owner* | % of Record Title Interest Owned | Date Interest Last Acquired |
| WYW84463 | B&H | 75% | 4/1/2001 | B&H | 75% | 8/1/2003 |
| | | | | B&H | 100% | 9/1/2008 |
| WYW101764 | TriCon | 100% | 3/1/1988 | B&H | 100% | 7/1/2003 |
| WYW101979 | TriCon | 100% | 3/1/1988 | B&H | 100% | 7/1/2003 |
| WYW103501 | TriCon | 100% | 5/1/1988 | B&H | 50% | 6/1/2000 |
| | | | | B&H | 100% | 8/1/2003 |
| WYW104183 | B&H | 100% | 6/1/1987 | B&H | 100% | 7/1/2003 |
| WYW104210 | TriCon | 100% | 5/1/1988 | B&H | 100% | 7/1/2003 |
| WYW105017 | TriCon | 100% | 8/1/1988 | B&H | 100% | 7/1/2003 |
| WYW105484 | B&H | 100% | 9/1/1987 | B&H | 100% | 7/1/2003 |
| WYW108093 | B&H | 100% | 4/1/2001 | B&H | 100% | 7/1/2003 |
| WYW108098 | B&H | 100% | 8/1/1988 | B&H | 100% | 7/1/2003 |
| WYW108889 | TriCon | 100% | 8/1/1988 | B&H | 100% | 7/1/2003 |
| WYW108891 | TriCon | 100% | 9/1/1988 | B&H | 100% | 7/1/2003 |
| WYW113112 | TriCon | 100% | 10/1/1990 | B&H | 100% of sections 4, 8, & 10 | 7/1/2003 |

---

* "B&H" is Barlow & Haun and "TriCon" is TriContinental.

** "The Date Interest First Acquired" is the date that one of the plaintiffs first obtained an interest in the specified lease.  See Jt. Stip. ¶¶ 60-81.  Ownership of most of these leases subsequently changed hands on one or more occasions before Barlow & Haun reacquired them on the date set forth in the final column.  Id.

| | | | | B&H | 50% of section 34 | 7/1/2003 |
|---|---|---|---|---|---|---|
| | | | | B&H | 100% of section 34 | 9/1/2008 |
| WYW113412 | TriCon | 100% | 10/1/1988 | B&H | 100% | 7/1/2003 |
| WYW114025 | TriCon | 100% | 11/1/1988 | B&H | 100% | 7/1/2003 |
| WYW114036 | TriCon | 100% | 11/1/1988 | B&H | 100% | 7/1/2003 |
| WYW114891 | TriCon | 100% | 6/1/1989 | B&H | 100% | 7/1/2003 |
| WYW117039 | TriCon | 100% | 3/1/1990 | B&H | 100% | 7/1/2003 |
| WYW121393 | B&H | 100% | 9/1/2008 | B&H | 100% | 9/1/2008 |
| WYW121394 | B&H | 100% | 9/1/2008 | B&H | 100% | 9/1/2008 |
| WYW121395 | B&H | 100% | 9/1/2008 | B&H | 100% | 9/1/2008 |
| WYW121402 | B&H | 100% | 9/1/2008 | B&H | 100% | 9/1/2008 |
| WYW122215 | B&H | 100% | 4/1/2001 | B&H | 100% | 7/1/2003[†] |
| WYW122863 | B&H | 100% | 9/1/2008 | B&H | 100% | 9/1/2008 |
| WYW123810 | B&H | 100% | 4/1/2001 | B&H | 100% | 7/1/2003 |
| WYW149082 | B&H | 100% | 2/1/1999 | B&H | 100% | 2/1/1999 |

---

[†] Lease 122215 expired under its own terms on November 30, 2012.  Tr. 3442 (Weaver).